IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## WESTERN DIVISION.

### JACKSON, APRIL TERM, 1907.

J. H. MALONE *et al.* *v.* J. J. WILLIAMS *et al.*

(*Jackson.* April Term, 1907.)

1. **CONSTITUTIONAL LAW.** Statute changing boundaries of a
   city is not unconstitutional.
   A statute (Acts 1907, ch. 184, art. 1, sec. 2), extending the bound-
   aries of the city of Memphis and annexing new territory there-
   to, is not unconstitutional for that reason. (*Post, pp.* 406, 411,
   412.)

   Acts cited and construed: Acts 1907, ch. 184, art. 1, sec. 2.

2. **SAME.** Statute authorizing exercise of police power without
   due process of law is unconstitutional, when.
   A statute (Acts 1907, ch. 184, art. 3, sec. 3), empowering the of-
   ficers of the city of Memphis, within that city, and for ten
   miles beyond the city limits, to enter into and examine all
   buildings to ascertain their condition for health and safety,
   to remove buildings that are dangerous, to direct and regulate

(390)

the building of fire walls, partitions, fences, ovens, smoke-stacks, etc., and authorizing the president of the commission having control of the city, whenever in his opinion a nuisance shall exist or shall have been declared by city ordinance, to abate the same in a summary manner at the cost of the owner of the premises where the nuisance exists, is unconstitutional as violative of that provision of the constitution (art. 1, sec. 8) declaring that no man shall be deprived of his life, liberty, or property without due process of law. (*Post, pp.* 406, 412-419.)

Acts cited and construed: Acts 1907, ch. 184, art. 3, sec. **3.**

Constitution cited and construed: Art. 1, sec. 8.

3. **SAME.** Statute prohibiting pigpens, cow stables, and dairies within two miles of a city is unconstitutional.

A statute (Acts 1907, ch. 184, art. 3, sec. 1, subsec. 17), empowering the municipal council of the city of Memphis by ordinance to prohibit pigpens, cow stables, and dairies within two miles of the city limits, is unconstitutional. (*Post, pp.* 419, 420.)

Acts cited and construed: Acts 1907, ch. 184, art. 3, sec. 1, subsec. 17.

Constitution cited and construed: Art 1, sec. 8.

4. **SAME.** Statute extending all governmental and police powers two miles beyond city limits is unconstitutional.

A statute (Acts 1907, ch. 184, art 1, sec. 3), providing that the city of Memphis may have and exercise, within its limits and for two miles outside thereof, all governmental and police powers, is unconstitutional as violative of that provision of the constitution (art. 1, sec. 8) declaring that no man shall be deprived of life, liberty, or property, without due process of law. (*Post, pp.* 406, 412-422.)

Acts cited and construed: Acts 1907, ch. 184, art. 1, sec. 3.

Constitution cited and construed: Art. 1, sec. 8.

Malone v. Williams.

5. **SAME.** Same. Statute giving such powers to a certain city is unconstitutional as class legislation.

A statute (Acts 1907, ch. 184, art. 1, sec. 3), providing that the city of Memphis may have and exercise, within its limits and for two miles outside thereof, all governmental and police powers, is unconstitutional as violative of that provision of the constitution (art. 11, sec. 8) prohibiting class legislation. (*Post, pp.* 406, 412-422.)

Acts cited and construed: Acts 1907, ch. 184, art. 1, sec. 3.

Constitution cited and construed: Art. 11, sec. 8.

6. **SAME.** Statute authorizing a city to establish and maintain public schools is not unconstitutional.

A statute (Acts 1907, ch. 184, art. 1, sec. 3), empowering the city of Memphis to establish and maintain public schools, is not unconstitutional by reason of such provision. (*Post, pp.* 408, 409, 422.)

- Acts cited and construed: Acts 1907, ch. 184, art. 1, sec. 3.

Case cited and approved: Ballentine v. Pulaski, 15 Lea, 633.

7. **SAME.** Taxation must be equal and uniform; adding expense of survey to city taxes is unconstitutional.

A statute (Acts 1907, ch. 184, art. 5, sec. 11), requiring the owners of property in the city of Memphis not laid off into lots or blocks, to furnish a description thereof to the tax assessor, and in case of his failure to do so, providing that the assessor may require a survey to be made and returned to him at the owner's expense, to be added to the tax levied and to be collected as part thereof, violates the constitutional provision (art. 2, sec. 28) for the equality and uniformity of taxation, and the other provision (art. 2, sec. 29) for the imposition of municipal taxes upon the principles established in regard to State taxation. (*Post, pp.* 422-424.)

Acts cited and construed: Acts 1907, ch. 184, art. 5, sec. 11.

Constitution cited and construed: Art. 2, secs. 28 and 29.

Malone v. Williams.

8. **SAME.** Statute authorizing Memphis alone to distrain for taxes not delinquent is void as class legislation.

A statute (Acts 1907, ch. 184, art. 5, sec. 23) providing that if any one in the city of Memphis, against whom a personal tax is assessed, which remains unpaid, whether the same shall be delinquent or not, shall move or be about to move out of the city, or shall remove or be about to remove his personal property from the city, the city treasurer or tax receiver may collect such personal tax by distress sale of any personal property of such person, found in the city, is unconstitutional as class legislation in creating an unconstitutional discrimination in favor of Memphis, because nowhere else in the State are tax-collecting officers permitted to distrain for taxes not delinquent. (*Post pp.* 424,425.)

Acts cited and construed: Acts 1907, ch. 184, art. 5, sec. 23.

Constitution cited and construed: Art. 11, sec. 8.

Case cited and approved: Memphis v. Fisher, 9 Bax., 239.

9. **SAME.** Statute authorizing Memphis alone to distrain for taxes not delinquent is void as not due process of law.

The statute whose provisions are stated in the foregoing headnote is also unconstitutional, because in violation of the constitutional provision (art. 1, sec. 8) declaring that no man shall be deprived of life, liberty, or property without due process of law. (*Post, pp.* 424, 425.)

10. **SAME.** Statute making taxes delinquent on one class of property at a time different from that on all other property is unconstitutional as class legislation.

A statute (Acts 1907, ch. 184, art. 5, sec. 24), making taxes on shares of stock in corporations delinquent on the first day of September, while the taxes on all other property are made delinquent (by sec. 21 thereof) on the first day of July, creates an unreasonable discrimination in favor of the holders of shares of stock in corporations, and is unconstitutional as class legislation. (*Post, p.* 426.)

Malone v. Williams.

Acts cited and construed: Acts 1907, ch. 184, art. 5, secs. 21 and 24.

Constitution cited and construed. Art. 11, sec. 8.

Case cited and approved: Stratton v. Morris, 89 Tenn., 497.

11. **SAME.** Statute making owner of property in Memphis absolutely liable to purchaser at tax sale for amount paid, etc., is void as class legislation.

A statute (Acts 1907, ch. 184, art. 5, sec. 46), providing that, if any person claiming title to real property in the city of Memphis under a tax deed shall be defeated in any suit by or against him for the recovery of the real property conveyed or purporting to be conveyed by the tax deed, the successful claimant shall be adjudged to pay such person the amount paid by the purchaser at the tax sale, and taxes thereafter paid, with twelve and one-half per cent. interest thereon, together with all costs, costs of improvements made, and costs of suit, with a lien on the property, is unconstitutional and void as creating an unreasonable discrimination in favor of the city of Memphis, as a means of collecting its taxes, and also in favor of purchasers at tax sales, under the authority of said city. (*Post, pp.* 426-430.)

Acts cited and construed: Acts 1907, ch. 184, art. 5, sec. 46.

Constitution cited and construed: Art. 11, sec. 8.

12. **SAME.** Statute making owner of property in Memphis absolutely liable to purchaser at tax sale for amount paid, etc., is void as not due process of law.

A statute whose provisions are stated in the foregoing headnote is also unconstitutional, because in violation of the constitutional provision (art. 1, sec. 8) declaring that no man shall be deprived of life, liberty or property without due process of law. (*Post, pp.* 426-430.)

Acts cited and construed: Acts 1907, ch. 184, art. 5, sec. 46.

Constitution cited and construed: Art. 1, sec. 8.

Case cited and approved: Stratton v. Morris, 89 Tenn., 497, 535.

Malone v. Williams.

**13. SAME.** Statute providing that no error whatever shall affect tax sales is void as not due process of law.

A statute (Acts 1907, ch. 184, art. 5, sec. 51), providing that no error in any assessment, tax book, notice, advertisement, book of sale, certificate of purchase, deed, paper, or document, relating to the assessment, levy, or collection of the taxes of the city of Memphis, shall in any manner affect or impair the validity of any sale or other proceeding for their collection, is unconstitutional as violating that constitutional provision (art. 1, sec. 8) declaring that no man shall be deprived of life, liberty or property without due process of law. (*Post, pp.* 430, 431.)

Acts cited and construed: Acts 1907, ch. 184, art. 5, sec. 51.

Constitution cited and construed: Art. 1, sec. 8.

**14. SAME.** Statute releasing Memphis from giving security on prosecution bonds is void as class legislation.

A statute (Acts 1907, ch. 184, art. 8, sec. 7), providing that the city of Memphis, in taking appeals or prosecuting writs of error, shall give bond, but shall be released from the obligation of law to furnish security, is unconstitutional as class legislation. (*Post, pp.* 431, 432.)

Acts cited and construed: Acts 1907, ch. 184, art. 8, sec. 7.

Constitution cited and construed: Art. 11, sec. 8.

Case cited and approved: Memphis v. Fisher, 9 Bax., 239.

**15. SAME.** Statute delegating power to Memphis to regulate and license ferries instead of county court is unconstitutional.

A statute (Acts 1907, ch. 184, art 3, sec. 1, subsec. 6), providing that the city of Memphis shall have exclusive power to license ferries and to regulate the same and the landing thereof within the limits of the city, is unconstitutional as an attempted delegation of such powers to the city of Memphis instead of the county court. (*Post, pp.* 432, 433.)

Acts cited and construed: Acts 1907, ch. 184, art. 3, sec. 1, subsec. 6.

---

Malone v. Williams.

---

Constitution cited and construed:    Art. 11, sec. 9.

Cases cited and approved:    Memphis v. Overton, 3 Yerg., 387; Guinn v. Eaves, 117 Tenn., 524.

**16. SAME.** Statute placing control of all elections in Memphis in the city council is void as not due process of law.

Where a statute (Acts 1907, ch. 184, art. 3, sec. 1, subsec. 37) declares that the municipal council of the city of Memphis shall have power to locate and establish as many voting precincts in each ward as may be necessary to conform to any rule or regulation fixed by the county court for holding State and county elections, and (by art. 8, sec. 14) declares that all special elections, not otherwise provided for, shall be held under such regulations as may be prescribed by ordinance, and (by art. 8, sec. 15) declares that provision may be made by ordinance for the holding of any election for any lawful purpose, and for conducting the same, and ascertaining and declaring the result thereof, and making a proper record to evidence the result, and (by art. 8, sec. 22) declares the qualifications of a legal voter in said city elections, it is held that the purpose of these provisions undoubtedly was to place the whole matter of elections within the city of Memphis, both general and special, and of every nature, and for all purposes, in the municipal council, and such attempt to deprive the city of Memphis of the benefit of the general election laws (Acts 1897, ch. 16) applicable to the entire State, and including the city of Memphis, is violative of the constitution (art. 1, sec. 8) as not due process of law. (*Post, pp.* 433-437.)

Acts cited and construed:    Acts 1907, ch. 184, art. 3, sec. 1, subsec. 37, art. 8, secs. 14, 15, and 22.

Constitution cited and construed:    Art. 1, sec. 8.

Case cited and approved:    Gotten v. Gowan, 113 Tenn., 175.

Malone v. Williams.

**17. SAME.** Statute placing control of all elections in Memphis in the city council is void as class legislation.

A statute placing the control of all elections in the city of Memphis, as stated in the foregoing headnote, is in violation of the constitution - (art. 11, sec. 8) prohibiting class legislation. (*Post, pp.* 433-437.)

Acts cited and construed: Acts 1907, ch. 184, art. 3, sec. 1, subsec. 37, art. 8, secs. 14, 15, and 22.

Constitution cited and construed: Art. 11, sec. 8.

**18. SAME.** Legislative history of an act is not determinative as to whether it is an independent or amendatory act, when.

While the legislative history of an act may be looked to as throwing light upon its meaning and purpose, no controlling importance can be attached to the fact that the bill in question (Acts 1907, ch. 184) was first introduced as an independent act, and then withdrawn and introduced as an amendatory act, for the purpose of avoiding the Pendleton law, and escaping the prohibition of the sale of intoxicating liquors in the city of Memphis. The purpose of such change cannot greatly aid in determining whether such act is an amendatory one, or an independent repealing act. (*Post, p.* 441.)

Acts cited and construed: Acts 1907, ch. 184.

Constitution cited and construed: Art. 2, sec. 17.

**19. SAME.** Statute whose caption shows amendment and whose body shows express repeal is void.

If the caption of an act shows that it was intended by the legislature as an amendatory act, while the body shows it, in direct terms, or express terms, to be a repealing act, such act must be held to be void. (*Post, pp.* 441, 442.)

Case cited and approved: Murphy v. State, 9 Lea, 373.

Malone v. Williams.

**20. SAME.** Declaration of legislative intent in caption of act is not conclusive as to whether it is amendatory or repealing.

The opinion of the legislature expressed in the caption of an act that it is an amendatory act is not conclusive; for the question whether the act is amendatory or is a repealing act, is a judicial one, to be determined from the body of the act. (*Post, pp.* 443, 444.)

Cases cited and distinguished: Poe v. State, 85 Tenn., 495; Shelton v. State, 96 Tenn., 521.

**21. SAME.** Statute operates as repeal of previous statutes on the same subject, when.

A subsequent act containing a full scheme of legislation upon the subject which it covers operates as a repeal of prior acts on the same subject. (*Post, p.* 445.)

Case cited and approved: Erwin v. State, 116 Tenn. 71, 89, 90, et seq.

**22. SAME.** Same. Case in judgment.

A statute (Acts 1907, ch. 184) whose caption purports to be an amendment of the charter of the city of Memphis, and whose body, as shown by the provisions quoted in the opinion of the court, embraces a complete new charter for that city, and therefore operates as a repeal, by implication, of the existing charter, and is unconstitutional as violative of that provision of the constitution (art. 2, sec. 17) requiring the subject of an act to be expressed in its caption. (*Post, pp.* 441-465.)

Acts cited and construed: Acts 1907, ch. 184.

Constitution cited and construed: Art. 2, sec. 17.

Cases cited and approved: Murphy v. State, 9 Lea, 373; Brinkley v. State, 108 Tenn., 475; Erwin v. State, 116 Tenn., 71, 89, 90, et seq.; United States v. Tynen, 11 Wall., 88; Murphy v. Utter, 186 U. S., 104.

Cases cited and distinguished: Hyman v. State, 87 Tenn., 109-111; Goodbar v. Memphis, 113 Tenn., 20; Wright v. Cunningham, 115 Tenn., 445.

Malone v. Williams.

**23. SAME. Unconstitutionality of parts of a statute renders the whole of it void, when.**

The provisions of the statute (Acts 1907, ch. 184) stated in head-notes 2-5 and 7-17, and therein held and shown to be unconstitutional, are not so merely incidental and subordinate that they can be stricken out without in any sense impairing the efficiency of the statute, and they are so numerous that it cannot be said that the legislature would have passed the act with such provisions omitted, and therefore the entire act must fall upon this ground. (*Post, pp.* 438, 439, 465, 466.)

See citations under headnotes 2-5 and 7-17.

Case cited and approved: State, ex rel., v. Trewhitt, 113 Tenn., 561, 571, 572, and numerous cases cited in the opinion, on page 439.

**24. SAME. Subject of an act must be expressed in its title. Case in judgment where it is not so expressed.**

Under a statute (Acts 1907, ch. 184) entitled "An act to modify and change in certain respects the form of government of the city of Memphis . . . and to amend its existing charter or charters . . . so as to continue its existence. with a more efficient form of government, . . ." provisions in the body thereof (art. 5, secs. 37, 41, 44) relative to State and county taxes; the provision (art. 3, sec. 1, subsec. 6), giving said city the exclusive power to license ferries; and the provision (art. 3, sec. 3) authorizing the president (the mayor), when he deems a nuisance to exist within the city or within ten miles of its limits, to abate the same, are not embraced in the title, and are therefore in violation of the constitution (art. 2, sec. 17) declaring that the subject of an act must be expressed in its title. (Post, *pp.* 466, 467.)

Acts cited and construed: Acts 1907, ch. 184, art. 3, sec. 1, sub-sec. 6; art. 3, sec. 3; art. 5, secs. 37, 41, 44.

Constitution cited and construed: Art. 2, sec. 17.

Case cited and approved: Knoxville v. Lewis, 12 Lea, 180.

Malone v. Williams.

25. **OFFICE. Defined; remedy for injury to it.**

An office is an incorporeal right, and consists in the right to ex-
ecute a public trust and to take the emoluments belonging to
it, and an injury to this right is an injury to a private right
for which there ought to be a remedy. (*Post, pp.* 467, 468.)

Cases cited and approved: Dodd v. Weaver, 2 Sneed, 670; Mem-
phis v. Woodward, 12 Heisk., 499; Moore v. Sharp, 98 Tenn.,
68; Nelson v. Sneed, 112 Tenn., 48; Maloney v. Collier, 112
Tenn., 100; Wammack v. Hollaway, 2 Ala., 33; Hoke v. Hender-
son, 15 N. C., 1.

26. **SAME. An officer cannot be legislated out of office without
an absolute and bona fide abolishment of the office.**

A statute (Acts 1907, ch. 184, art. 8, sec. 8) abolishing and vacat-
ing the offices existing under the charter of the city of Mem-
phis, and reënacting or recreating the same offices under dif-
ferent names with duties somewhat enlarged, but substantially
the same as the respective and corresponding abolished offices,
is void. While an office may be abolished, yet the officer can-
not be legislated out of office without an abolishment thereof.
(*Post, pp.* 467-480.)

Acts cited and construed: Acts 1907, ch. 184, art. 8, sec. 8.

Cases cited and approved: Haynes v. State, 3 Humph, 480;
Halsey v. Gaines, 2 Lea, 316, 324, 325; State v. Leonard, 86
Tenn., 485; Judges Cases, 102 Tenn., 510, 538-540; State
v. Lindsay, 103 Tenn., 625; Redistricting Cases, 111 Tenn., 234;
State, ex rel., v. Hamby, 114 Tenn., 36; and numerous cases
from other States cited in the opinion, on pages 471-478.

---

FROM SHELBY.

---

Appeal from the Chancery Court of Shelby County.—
F. H. HEISKELL, Chancellor.

Malone v. Williams.

G. T. FITZHUGH, T. K. REDDICK, T. B. TURLEY, and JOHN E. BELL, for complainants.

E. E. WRIGHT, R. E. MAIDEN, and THOMAS M. SCRUGGS, for defendants.

MR. JUSTICE NEIL delivered the opinion of the Court.

The bill in this case was filed by certain persons who were elected as officers of the city of Memphis under its charter as it existed prior to March 27, 1907, against certain other persons claiming to be officers of the same city by appointment of the governor under an act passed on the date last mentioned.

The purpose of the bill was to have the above-mentioned act of March 27, 1907 (Senate Bill No. 289), declared unconstitutional and void.

It is alleged that the act referred to was first introduced as an independent act, imposing upon the city of Memphis a new charter, and that this act bore the following title:

"An act to grant a new charter to the city of Memphis, to repeal an act entitled 'An act to establish taxing districts in the State, and to provide the means of local government for the same'; and being chapter 11 of the Acts of 1879, and all the acts amendatory thereof, constituting the charter of the city of Memphis, and to repeal chapter 54 of the Acts of 1905, entitled 'A bill to be entitled "An act to amend an act entitled 'An act to es-

118 Tenn—26

tablish taxing districts in this State and to provide the means of local government for the same,' " ' the same being chapter 11 of the Acts of 1879 and all the acts amendatory thereof, constituting the charter of the city of Memphis."

It is further alleged that at the time the bill bearing the above caption was introduced there was pending in the legislature a bill known as the "Pendleton Bill," with every prospect of the latter passing and becoming a law; that the result of passing the new charter as an independent act, the Pendleton Bill becoming a law in the meantime or thereafter, would be to prohibit the sale of intoxicating liquors in the city of Memphis, and that in order to avoid this result, the bill as originally introduced was withdrawn by the parties in charge of the legislation, and a new bill—that is, Bill No. 289— was introduced, purporting in its caption to be an amendment of the former act, rather than a new and independent one. A copy of the bill, the title of which is above given, as first introduced, was exhibited with the complainants' bill in equity in the present case, and on comparison it appears to be substantially the same as the act of March 27, 1907 (Senate Bill No. 289), under examination herein.

It is alleged that, notwithstanding the caption of the act of March 27, 1907, purporting an amendment of the former charter of Memphis, the body of the bill shows a new and independent scheme of legislation covering the

Malone v. Williams.

whole subject, and thereby, if good, effecting an implied repeal of the former charter; and therefore that, while the caption of the act purports an amendment, its body purports a repeal, and hence the caption and the body are in conflict, article 2, section 17, of the constitution of the State is thereby violated, and the act is void.

It is further alleged that the act is void because several special matters embraced in the body of it are not covered by the title, and for these reasons it is in violation of article 2, section 17. These special matters need not be set out at this point, but will be presently referred to with more particularity.

[It is alleged that, "if the said defendants are permitted to carry out their unlawful purpose of the government of the said city, complainants will be deprived of the benefits and emoluments of the offices to which they have been justly elected and which they are lawfully entitled to hold and enjoy until the expiration of their respective terms;" that they are legally required to hold their various offices until the expiration of their terms, and their successors are duly elected and qualified; that "they will suffer irreparable injury on account of the illegal acts of the defendants, unless said defendants are restrained by the court, and they have no adequate remedy at law."

These allegations were made, following other allegations to the effect that the defendants were threatening to take charge of the city government under the

act of March 27, 1907, and would take charge of it unless restrained.

The bill was filed by James H. Malone, mayor of the city, and B. H. Henning, a member of the board of fire and police commissioners, George C. Love, a member of the board of public works and chairman of that board, J. S. Dunscomb, R. A. Utley, E. H. Crump, and Frank H. Hill, members of the board of public works, and A. C. Floyd, judge of the city court; and it was alleged that under the charter of the city as it existed prior to the act of March 27, 1907, the term of each of these officers ran until January 11, 1910, except that of George C. Love, which latter expired in January, 1908.

The bill was filed against the following persons, all appointed by the governor, pursuant to the terms of the said act of March 27, 1907, viz: J. J. Williams, John T. Walsh, David S. Rice, E. B. Le Master, and Sidney M. Neely, members of the commission provided for in the said act, J. J. Williams having been appointed president, John T. Walsh, vice president, and the defendants David S. Rice, E. B. Le Master and Sidney M. Neely members of the said commission, and the defendant George G. Alban, appointed judge of the court designated in the act as the "Corporation Court."

The bill alleged that these defendants were about to take charge of the city government, thereby ousting the complainants; that said contemplated act was wrongful

and would result in great confusion in the affairs of the city.

There was a prayer for process against the defendants, and for a temporary injunction against interference with the city government until the matter could be heard by the chancellor, and that on final hearing the injunction be made perpetual.

The bill was filed April 24, 1907, and on the same day a temporary restraining order was issued against the defendants. On the 26th of the same month the chancellor heard the application for a temporary injunction, and disallowed it on May 4th, and on that day he vacated the temporary restraining order.

On the 6th of May the defendants filed a demurrer to the bill, assigning numerous grounds, all of which are embraced in the first one, which is that there is no equity in the bill. On the same day the chancellor sustained the demurrer and dismissed the bill. From this decree the complainants prayed and obtained an appeal to this court and have here assigned errors.

The errors assigned are as follows:

"The chancellor erred (1) in not declaring the act in question unconstitutional because it repeals the former charter of the city of Memphis, while purporting in the caption only the amendment of it; (2) in holding that the act in question was only an amendment to the former charter, and not a new charter for the city of Memphis; (3) in holding that the legislature had the power to remove municipal officers without abolishing their offices;

(4) in holding that the act in question is in all respects constitutional, and in denying complainants the relief prayed for."

The assignments present, from different points of view, the single question whether the act of March 27, 1907, is unconstitutional in whole or in part; but the solution of this general question requires the consideration and disposition of many particular contentions advanced by the parties. We shall not take up these controversies in the order in which they are presented in the assignment of errors or in the briefs of counsel, but in that order which seems to us the most convenient.

It is alleged in the bill that the act of March 27, 1907, violates the constitution in the following particulars, viz.:

"(1)   In section 2 of article 1 of said act it undertakes to extend the boundaries of said city and annex new territory thereto.

"(2)   In section 3 of article 1 it is provided that said city is to 'have and exercise within the city limits and for two miles outside thereof all governmental powers and police powers, subject to the limitations prescribed by the constitution and laws of the State and of the United States.'

"Within the two-mile strip over which the city of Memphis is thus given all governmental powers, there are two other municipalities, Lenox and Binghampton, duly incorporated by the State of Tennessee and each having a full quota of officers and all the usual agencies and

instrumentalities of city government, and being now in the full exercise thereof.

"The above provisions, if held valid, will certainly result in serious conflict between the two municipalities above named and the city of Memphis.

"(3)    In section 3 of article 3 it is provided:

" 'Sec. 3.    Be it further enacted, that the city, through its officers and agents, may at all reasonable times, with-. in the city and within ten miles of the city limits, enter into and examine all dwellings, lots, yards, inclosures and buildings, cars, boats and vehicles of every description, to ascertain their condition for health, cleanliness and    safety;    take    down    and    remove    buildings, walls or superstructures that are    or    may    become dangerous, or require owners to remove or put them in    a    safe    and    secure    condition,    at    their own expense; may direct and regulate the building and maintenance of partition, parapet and fire walls, partitions, fences, ovens, smokestacks, stove flues, hot air flues, fireplaces, boilers, kettles, stovepipes, and the erection and cleaning of chimneys; shall provide for the safe construction and repair of all private or public buildings within the city; compel persons to aid in extinguishing fires, or in the preservation of property likely to be destroyed or stolen.

" 'And the president, whenever in his opinion a nuisance exists upon public or private property, or whenever a nuisance has been so declared by ordinance, is authorized to abate and remove such nuisance and the cause

thereof in a summary manner, at the cost of the owner or occupant of the premises where the nuisance or cause thereof may be, and for that purpose may enter and take possession of any premises or property where such nuisance may exist or be produced.'

"This ten-mile strip includes the two cities above mentioned and much outside territory, where there are now living probably twenty thousand people, over all whose dwellings, buildings, cars, boats, and vehicles of every description the city of Memphis is thus given absolute control, with power to destroy the same, and direct and regulate the erection or repair of their buildings, at the owner's expense, through its officers and agents in the selection of which these outside people have no voice or vote whatever.

"Moreover, under this provision, one individual, namely, the president of the commission, is authorized, 'whenever in his opinion a nuisance exists,' to abate the same by a summary destruction of the property at the cost of the owner or occupants of the premises. Complainants are advised, and so charge, that this section also violates section 8 of article 1, and section 8 of article 11 of the constitution of Tennessee.

"(4) In section 3 of article 1 the city of Memphis is given the power 'to establish and maintain public schools.'

"Complainants are advised that the city government as it exists under the acts which the caption of Exhibit C. purports to amend, had absolutely no authority over

the public schools within its limits; that said schools were under the control and authority of a separate public corporation created by the acts of 1868 and 1869, known as the 'Board of Education of Memphis.' Said board consists of five members elected by the people under laws entirely different and disconnected from the laws constituting the charter of Memphis.

"They are also advised that the power given the city of Memphis to establish and maintain public schools not only introduces an entirely new and vitally important subject, but one that is most dangerous and disturbing, and which, if attempted to be exercised, would inevitably result in the complete disorganization, if not destruction, of the excellent system of public schools now existing in the city of Memphis, which has, so far, been purposely kept entirely free from any interference or control of the city government.

"(5)    That article 5 of said act, on the subject of revenue and taxation, contains several sections vitally material to the scheme of legislation set forth in said act which are clearly in violation of several provisions of the constitution of the State of Tennessee.

"(a)    Section 11 of article 5 of said act.

"(b)    Sections 23 and 24 of the same article.

"These sections provide a new and different scheme or system for the assessment of the property from that provided in the general assessment act of 1903, and extend to certain corporations rights and privileges denied to the body of the people of the city of Memphis. While

taxes on all other classes of property become delinquent on the first day of July, an exception is made in favor of taxes on shares of stock in corporations, which do not become delinquent until the 1st day of September.

"These sections violate section 8 of article 1, section 8 of article 11, and section 17 of article 2.

"Complainants are also advised that sections 46 and 51 of article 5 of said act violate section 8 of article 1 and section 8 of article 11 of the constitution.

"Complainants are further advised, and so charge, that section 7 of article 8 of said act, which releases the city of Memphis from the obligation imposed by the general law of the State to furnish security in prosecuting appeals and writs of error in any judicial proceedings, is in clear violation of section 8 of article 11, as well as section 17 of article 2, of the constitution of the State.

"Complainants are further advised and so charge that sections 14, 15 and 22 of article 8 and subsection 37 of section 1 of article 3 of said act, under which commissioners of the city are authorized to hold any election for any lawful purpose in said city, and to ascertain and declare the result thereof, introduce an entirely new subject, which is in no way referred to in the caption of the act, and are in violation of the same provisions of the constitution last above referred to. These provisions of said act materially change the general election laws of the State, and authorize the five commissioners in control of the city to hold elections which were heretofore held by commissioners of registration under the laws applicable

to the entire State. The effect of these provisions, if valid, would be to authorize said commissioners, not only to hold all special elections in said city, but also to prescribe the rules and regulations governing the elections at which their successors are to be elected, and at which they themselves might and probably would be candidates for re-election.

"Complainants are advised, and so charge, that each one of the seven matters above named constitutes an entirely new subject, not referred to directly or indirectly in, or in any way connected with or suggested by, the title of the act, Exhibit C, and that each renders said act unconstitutional, null and void."

Other special points of unconstitutionality insisted upon are the following:

In subsection 6 of section 1 of article 3 of the act, the municipal council is given exclusive power to license ferries and to regulate the same, and the landings thereof within the limits of the city, and to fix and prescribe the charges and fees for ferries. This is objected to as unconstitutional in itself, and the introduction of a subject not covered by the caption.

In sections 37, 41, and 44 of article 5, which relate to revenue and taxation, there are several provisions which cover State and county taxes. This, it is claimed, is the introduction of a new subject.

We shall now consider the foregoing several objections.

There is no force in the contention raised in respect of the boundaries. Every municipal corporation must have

definite boundaries, and these may be fixed by the Legislature in enacting the charter, and as part thereof, and they may be subsequently changed by the same body. 1 Dillon on Munic. Corp. (3d Ed.), sections 182, 185; 1 Abbott, Munic. Corp., secs. 55, 57, 58, 63.

We shall consider together section 3 of article 1, concerning the two-mile strip, and section 3 of article 3, concerning the ten-mile strip.

The provision upon this subject in the original taxing district act (chapter 11, p. 16, section 3, of Acts of 1879) and in the first amendment thereto (chapter 84, section 1, Acts of 1879), the first of which acts the present caption purports to amend, was as follows:

"Said government shall have the power to pass all laws to preserve the health of the taxing district; to define, prevent and remove nuisances within the taxing district; and for a distance of one mile outside of the same; to make quarantine laws and enforce the same within ten miles of the taxing district."

We are not aware that these special provisions of the acts referred to have ever been drawn in question. The acts themselves, with their several amendments, have been the subject of numerous adjudications, and, so far as questions have been made upon them, the acts have been upheld.

In *Chicago Packing Co.* v. *Chicago*, 88 Ill., 221, 30 Am. Rep. 545, an act was upheld which conferred upon cities and villages the power to regulate establishments engaged in slaughtering animals for the distance of one

mile beyond their corporate limits, even if that should lap over and embrace a portion of the territory comprised in the boundaries of another municipality. 1 Dillon on Munic. Corp., sections 184, note 4; Id. (3d Ed.), 212.]

In the same volume (section 144) it is said by the author:

"The general nature and scope of the authority, as it is not infrequently bestowed, are well illustrated by a case in Maryland. By its charter the city of Baltimore was vested with full power and authority to enact all ordinances necessary to preserve the health of the city, prevent and remove nuisances, and to prevent the introduction of contagious diseases within the city and within three miles of the same.' Commenting on this provision of the charter, the court of appeals say: 'The transfer of this salutary and essential power is given in terms as explicit and comprehensive as could have been used for such a purpose. To accomplish, within the specified territorial limits, the objects enumerated, the corporate authorities were clothed with all the legislative powers which the general assembly could have exercised. Of the degree of necessity for such municipal legislation the mayor and city council of Baltimore were the exclusive judges. To their sound discretion is committed the selection of the means and manner (contributory to the end) of exercising the powers which they might deem requisite to the accomplishment of the objects of which they were made the guardians. "To prevent the intro-

duction of contagious diseases within the city, and within three miles of the same," they might impose heavy penalties on the captain, owner, or consignee of any ship or other vessel entering the port of Baltimore, on board of which smallpox or other contagious diseases might prevail; or they might seek the accomplishment of their object by causing the vessel and all persons to be taken possession of and controlled until their purification and disinfection were effected, and impose on the captain, owner or consignee the payment or reimbursement of all the expenses incurred by such proceedings; or they might adopt at the same time, both suggested remedies, if for the successful and faithful execution of their powers they deemed it necessary to do so' "—citing *Harrison* v. *Baltimore*, 1 Gill. (Md.), 264. In section 354 it is said:

"By-laws made by municipal corporations, with respect to a liberty or franchise granted them with local jurisdiction beyond the limits of the municipality, are as binding upon the persons going into the liberty as the by-laws of the city upon those who come within its walls."

In 2 Abbott on Municipal Corporations, pp. 1383, 1384, it is said:

"Municipal ordinances or resolutions can have no extraterritorial force or effect, and this is true even in cases where a municipality may have acquired property outside its geographical limits. . . . It is, of course, within the power of the State legislature to authorize

Malone v. Williams.

subordinate corporations to pass ordinances or laws which shall have a restricted effect beyond their limits. This has been done in some cases for the purpose of enabling a particular municipal corporation to suppress nuisances detrimental to the public health and morals."

In 1 Dillon on Municipal Corporations, however, it is said:

"No implied power to pass by-laws, and no express general grant of the power, can authorize a by-law which conflicts either with a national or State constitution, or with the statute of the State, or with the general principles of the common law adopted or in force in the State." Section 366.

The same author says:

"It is to secure and promote the public health, safety, and convenience that municipal corporations are so generally and so liberally endowed with power to prevent and abate nuisances. This authority may be constitutionally conferred on the incorporated place, and it authorizes its council to act against that which comes within the legal notion of a nuisance; but such power, conferred in general terms, cannot be taken to authorize the extrajudicial condemnation and destruction of that as a nuisance which, in its nature, situation, or use, is not such. Speaking upon this subject in a very recent case, where a city, under authority to prevent and restrain encroachments on rivers running through it, commenced summary proceedings to remove a private wharf,

an eminent judge uses this language: 'But the mere declaration by the city council that a certain structure was an encroachment or obstruction did not make it so; nor could such declaration make it a nuisance, unless it in fact had that character. It is a doctrine not to be tolerated in this county that a municipal corporation, without any general laws either of the city or of the State, within which a given structure can be shown to be a nuisance, can, by the mere declaration that it is one, subject it to removal by any person supposed to be aggrieved, or even by the city itself. This would place every house, every business, and all the property in the city at the uncontrolled will of the temporary local authorities.' " Section 374.

By recurring to the provisions of article 3, section 3, above quoted, it is seen that the "officers" and "agents" of the city are given the power, within the city and for the space of ten miles beyond the city limits, "to enter into and examine all dwellings" and "buildings," to ascertain their condition for health, cleanliness, and safety; to "take down and remove buildings, walls or superstructures that are, or may become, dangerous, or require owners to remove or put them in a safe and secure condition, at their own expense;" that these officers or agents "may direct and regulate the building and maintenance of partition, parapet and fire walls, partitions, fences, ovens, smokestacks, stove flues, hot air flues, fireplaces, boilers, kettles, stovepipes, and the erection and cleaning of chimneys."

Malone v. Williams.

It is observed that the following remarkable provision is added: "And the president, whenever in his opinion, a nuisance exists upon public or private property, or whenever a nuisance has been so declared by ordinance, is authorized to abate and remove such nuisance and the cause thereof in a summary manner, at the cost of the owner or occupant of the premises where the nuisance or cause thereof may be, and for that purpose may enter and take possession of any premises or property where such nuisance may exist or be produced."

Of these extraordinary provisions it is to be noted that the powers of the president and of the other "officers" and agents of the city are not to be defined or controlled by ordinance. It is noted, as to the president, the power is expressly given to him to act upon his own opinion—"whenever in his opinion"—as to the existence of a nuisance upon public or private property. In section 1 of article 3 it is provided: "That all powers conferred upon the city by the charter shall be exercised by ordinance, except as otherwise provided in this charter, and the president and municipal council shall have power by ordinance, not inconsistent with the constitution and laws of this State, and subject to the limitations expressed in this charter." Then follow 39 subsections, setting forth what may be done by ordinance. Next follows section 2 of the same article, concerning the apportionment of revenue annually by ordinance. After these come the extraordinary provisions which we have

118 Tenn—27

quoted and which attempt to vest in the president and the other "officers and agents" of the city unlimited and irresponsible power over the property and estates, not only of every soul in the city of Memphis, but within a radius of ten miles beyond the boundaries of the city— the power to vex and harass any and every man, or woman, or child, even, on whose property they may choose to impose burdensome restrictions; the power even to destroy the property of any citizen of Memphis, or of any one living within ten miles of Memphis. These vast powers are not to be defined, directed, or controlled by ordinance. The president and the other officers and agents of the city are themselves to decide upon these matters, and to act upon their decisions, and to impose burdens or destroy property as they may deem best; that is, upon these subjects they hold all legislative, judicial, and executive powers—that is to say, arbitrary power. Such provisions cannot be upheld in a free country. No man is wise enough, or good enough, to be vested with arbitrary power over the property of his fellow citizens. No body of men, composing a municipal council or other organization, is wise enough, or good enough, to be intrusted with such power. The provisions which give these powers are in violation of section 8 of article 1 of our State constitution, which provides: "That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty or property, but by the judgment

of his peers or the law of the land." They are therefore void.

The extraordinary and baleful character of the provisions which we have declared void is emphasized, when we compare them with the powers given upon the same general subjects in sec. 1, subsec. 17, article 3, which are to be exercised by ordinance. In subsection 17 power is given to the municipal council by ordinance "to establish and enforce quarantine laws and regulations; to prevent the introduction and spread of contagious diseases in the city and within ten miles thereof; . . . to prohibit, remove or regulate the erection of soap factories, stockyards, slaughterhouses, pigpens, cow stables, dairies, coal oil and vitriol factories, and all other factories which the municipal council may by ordinance declare to be nuisances, within prescribed limits in the city and within two miles thereof."

In this section it is perceived that the powers conferred within the radius of ten miles beyond the boundaries of the city are for quarantine purposes simply, as in chapter 11, p. 15, Acts of 1879, and that the powers here conferred within the two-mile limit beyond the corporate boundaries are most of them of the special character sanctioned by the authorities for the protection of municipalities against factories dangerous to the health of a city. We do not think, however, that the legislature could constitutionally empower a city by ordinance to prohibit "pigpens, cow stables, and dairies" for two miles beyond the city limits. For the same reason we

are of the opinion that the provision contained in article
1, section 3, is void, so far as it purports to confer pow-
er beyond the city limits. That provision reads:   The
city "may have and exercise within the city limits, and
for two miles outside thereof, all governmental powers
and police powers, subject to the limitations prescribed
by the constitutions and laws of the State and of the
United States." The last clause, beginning with the
words, "subject to the limitations," etc., means nothing,
since all municipal ordinances are by their very nature,
and the subordinate character of municipalities as com-
pared with the nation and the State, subject to the lim-
itations prescribed by the constitution and laws
of the State and of the United States. The pro-
vision, with this surplusage elided, is simply that
the city may have and exercise, not only within the city
limits, but for two miles outside thereof, "all govern-
mental powers and police powers." We have seen that,
*ex necessitate,* a limited police power may be granted
to municipalities over a small section of country sur-
rounding their boundaries for their protection against
nuisances, and to safeguard the health of the people re-
siding in them; but even this is hard to justify on any
principle other than that the municipality is in such
matters the agent of the State itself for the protection
of the people of the State.   But that agency cannot be
used as a basis for conferring power upon municipalities
over territory outside of them any further than bare
necessity requires.   Certain it is there can be no justifi-

cation for extending over an outside strip of country, two miles in width, or of any less width, all the governmental powers of the city, or even all the police powers of the city. The delegation of such extensive power is in violation of at least two sections of the constitution. The exercise of governmental powers over the people embraced within any area or territory, necessarily involves control to a very material degree over their persons and property. The control in the present instance is given, not to any one chosen or elected by the people over whom they are to exercise dominion, but to the officers of a foreign body, chosen for the service of that body, and not for the people to be affected by the powers given. No other people of the State are so burdened, and no other city is so favored with dominion beyond its borders. The necessary effect of such legislation, if valid, would be to subject the property of the people inside of the strip referred to to the taxing power of the city of Memphis, which would result in taking their property for the use of the city, from the application of which they could derive no benefit. It would also impose upon them the whole burden of the police powers of the city, to be exercised for the benefit of the latter, and thereby would they be caused to bear a weight borne by no other people of the State. We need not consider whether the legislature would have the power to impose such burdens upon the people living near to all of the other cities and towns of the State, since such general legislation would immed-

iately produce an uprising which would insure its repeal. But upon the general question we do not hesitate to say that the legislature has no more power to take the property of one man and give it to a corporation, municipal or otherwise, than it has to give his property to another citizen; and no more has it power to impose burdens upon the citizen in favor of a municipal corporation of which he is not a member than it has to impose burdens upon him in behalf of another man who has rendered to him no equivalent. For the reasons above given, we think that the clause under examination is in violation of both article 1, section 8, of the constitution, and also of article 11, section 8. ⋊ ⊀ ʔ ( ɑ ʋɽ

We do not think there is any force in the objection that the act in question gives to the city the power to establish public schools within its borders. This is a matterter that may be properly included within municipal powers. *Ballentine v. Mayor and Aldermen of Pulaski,* 15 Lea, 633; 1 Abbott, Munic. Corp., p. 702; 2 Abbott, Munic. Corp., p. 1219; 3 Abbott, Munic. Corp., p. 2378 et seq.

Article 5 is entitled "Revenue—Taxation."

Under this article sections 11, 23, and 24, also 46 and 51, are attacked as unconstitutional.

Section 11 reads as follows:

"Sec. 11. Be it further enacted, that the assessor, shall return, on his assessment book of real property, in tabular form, each parcel of real estate subject to taxation, with the description and value thereof, and in separate column the value attached by the assessor to each

parcel or description, with the name of the owner, if known. When any property is not laid off in lots or blocks, the assessor shall describe same by any pertinent description, and for the purpose of such description he may require the owner thereof to furnish such description. It shall be the duty of all owners of property, not so laid off in lots or blocks, to furnish to the assessor a sufficient description thereof, and in case of the failure of any such owner to furnish such description at least fifteen days before the time fixed for the return of the assessment, the assessor may require the city engineer to make and return to him a survey of such property, *and the expenses of such survey shall be returned by the assessor, together with his assessment of the property, and shall be added to the tax to be levied upon the property and collected as a part thereof."*

So much of the foregoing section as is underscored or italicized violates article 2, sections 28, 29, of the State constitution, which require equality and uniformity in taxation. Section 28 provides that "all property shall be taxed according to its value, that value to be ascertained in such manner as the legislature shall direct, so that taxes shall be equal and uniform throughout the State." Section 29 provides that municipal taxes shall be imposed "upon the principles established in regard to State taxation." It is not sufficient merely that all per-in the State is this burden imposed upon taxpayers; sons within the city may be burdened with the additional expense referred to in the section quoted. Nowhere else

that is, the burden of paying the expenses of a survey made by the taxing power. The imposition of such a burden violates the general principle of uniformity and equality prescribed by the constitution, since the matter of description is not local to any city or town, but is a general requirement covering the whole State.

The next section complained of reads as follows:

"Sec. 23. Be it further enacted, that if any one against whom a personal tax is assessed, and which is due and unpaid, whether the same shall be delinquent or not, shall have removed out of the city, or shall be about to remove out of the city, or shall have removed or be about to remove his personal property out of the city, it shall be the duty of the city treasurer or tax receiver, at once to proceed to collect such personal tax by distress sale of any personal property of such person that shall be found in the city of Memphis, as provided in the preceding section of this article for the distress and sale of personal property for delinquent personal taxes."

This section is in violation of article 11, section 8, of the State constitution. That section provides: "The legislature shall have no power to suspend any general law for the benefit of any particular individual; nor to pass any law for the benefit of individuals inconsistent with the general laws of the land; nor to pass any law granting to an individual or individuals rights, privileges, immunities or exemptions other than such as may be by the same law extended to any member of the

community who may be able to bring himself within the provisions of such law."

It is true that the legislature has power to grant special charters to municipal corporations, and may, in general, include within those charters such peculiar provisions, not in conflict with the constitution, as may be needed for the convenience and well being of the particular community. But where these provisions are so general as to fall within a classification common to all the citizens of the State, there can be no justification for erecting a single city into a class by itself, with provisions more onerous than are imposed upon all other citizens occupying the same situation, or more advantageous. It was so held many years ago, in a case cited infra, where the legislature attempted to exonerate the city of Memphis from the burden of executing cost or appeal bonds. By the general laws of the State, applicable to all citizens, tax officers are permitted to distrain for delinquent taxes. Nowhere else in the State are they permitted to distrain for tax not delinquent, except in the city of Memphis under the section above quoted. The said section creates an unconstitutional discrimination in favor of the city of Memphis, and thus is in violation of the section of the constitution above referred to. It imposes upon the citizens of Memphis a burden nowhere else imposed, and is in violation of article 1, sections 8, of the constitution. There can be no good reason for singling out the city of Memphis for these discriminations.

The next section complained of, so far as need be quoted, reads as follows:

"Section 24.    Be it further enacted that if any tax, interest, or cost shall remain unpaid on the first day of September on any share or shares of stock of any corporation, the shares of which are taxable under this charter, or any ordinance of the city, it shall be the duty of the city treasurer, or tax receiver to sell such share or shares to the highest bidder," etc.

By section 21, the first day of July is made the day of delinquency as to taxes on all other kinds of property. The constitutional objection suggested is that an unreasonable discrimination is made in favor of holders of shares of stock in corporations, by giving to these persons until the 1st day of September. We think this objection is well taken, and makes the section referred to (section 24) unconstitutional as in violation of article 11, section 8, of the constitution. *Stratton Claimants* v. *Morris Claimants,* 89 Tenn., 497, 15 S. W., 87, 12 L. R. A., 70.

The next section complained of is the following:

"Sec. 46.    Be it further enacted that in any suit or proceeding involving, or in any manner calling in question, the title or right of the grantee in a tax deed, or those claiming under lien of, to, or in the real property conveyed, or purporting to be conveyed, by such tax deed, executed substantially as provided in the preceding section, the person claiming title adverse to the title conveyed or purporting to be conveyed, by such tax deed,

Malone v. Williams.

shall be required to prove, in order to defeat said tax deed, either that the taxes, interest and costs were paid before the sale; that the real property therein described was not subject to taxation for the year or years stated in the deed; that the real property therein described had been redeemed from the sale at the date of the deed, or the tender of the redemption money had been made to the city treasurer before the execution and delivery of the deed, in accordance with the provisions of this article, and that such redemption was had or attempted to be had for the use and benefit of the person having the right of redemption under this article; and if any person claiming title under a tax deed executed substantially as provided for in the preceding section shall be defeated in any suit or proceeding by or against him for the recovery of the real property conveyed, or purporting to be conveyed, by such tax deed, the successful claimant shall be adjudged to pay such person claiming under such tax deed the full amount of all money paid by the purchaser at the tax sale for such real property, together with interest at the rate of twelve per cent. per annum; and also the amount of taxes—State, county, municipal, general, or special—paid by the purchaser, his heirs, or assigns after the date of the certificate of purchase, with the same rate of interest per annum, together with the costs of tax deed and fees for recording the same; also the total costs of all improvements made thereon, and all costs in the case, which judgment shall be a lien upon the real property in controversy, and shall

bear interest at the same rate per annum, and may be enforced by execution or sale as in other cases of judgments and decrees of such court against the land in controversy."

Under the foregoing section, if any citizen's property has been unlawfully subjected to a tax sale, and he shall sue such unlawful holder of this property and defeat him in the litigation, he must nevertheless pay to his defeated adversary whatever price the latter may have paid at such unlawful sale; and not only this, but he must pay him twelve per cent. interest per annum; and not only this, but any State, county, municipal, general, or special taxes which such illegal purchaser may have paid and in addition twelve per cent. on these amounts; and not only this, but the costs of the unlawful tax deed and fees for recording it; and not only this, but the total cost of all improvements which the unlawful purchaser may have made upon the property of the lawful owner; and not only this, but all the costs of the case in which he has defeated the unlawful holder of his property. All these sums, with accumulated interest, are made a lien upon the lawful owner's property, and the same is to be subjected to sale for the exoneration of these sums imposed.

The foregoing section is unconstitutional and void, in that it creates an unreasonable discrimination in favor of the city of Memphis as a means of collecting its taxes, and also in favor of purchasers at tax sales under the authority of said city, in violation of article 11, section 8, of the constitution of the State. It is also unconstitu-

tional as placing an unreasonable burden upon the tax-payers of the city of Memphis, in violation of article 1, section 8, of the constitution. It is also unconstitutional as in violation of that implied restriction of the State constitution which provides that the private property of one citizen shall not be taken from him and given to another. *Stratton Claimants* v. *Morris Claimants,* supra, Such a statute cannot be the law of the land. *Stratton Claimants* v. *Morris Claimants,* 89 Tenn., 535, 15 S. W., 87, 12 L. R. A., 70. It is to be observed that the section just quoted does not limit the ground on which the claimant under the tax deed may be defeated. It is observed that the language is as general as it can be made: "If any person claiming title under a tax deed, executed substantially as provided for in the preceding section, shall be defeated in any suit or proceeding by or against him for the recovery of the real property conveyed or purporting to be conveyed, by such tax deed, the successful claimant shall be adjudged to pay such person claiming under such tax deed the full amount of all money paid by the purchaser at the tax sale for such real property, together with interest at the rate of twelve per cent. per annum." Under this section the owner, the lawful owner of the property, would be onerated with the duty of making payment to the unlawful purchaser of the amount of his bid and twelve per cent. interest, and of removing all of the other burdens appearing in the subsequent part of the section, even though he should defeat the claimant to his property by showing that he

himself had already paid the taxes on the property before the sale, or by proving that his property was not subject to taxation for the year or years stated in the deed; that is to say, no matter how illegal or unjust the sale may have been, the owner of the property is bound to shoulder all of the consequences arising out of the mutual mistake of the city and the purchaser at the tax sale, and this, although the lawful owner is wholly blameless.

The next section complained of reads as follows:

"Sec. 51.  Be it further enacted that each assessment, land tax book, or personal tax book, notice, advertisement, book of sale, certificate of purchase, deed, paper, and document of every nature and description, made or executed under or pursuant to this article, shall be liberally construed, to effect the purposes and objects of this article, and in determining the validity thereof. *No error or irregularity in any assessment, land tax book, personal tax book, notice, advertisement, book of sales, certificate of purchase, deed, paper, or document aforesaid, relating to the assessment, levy, or collection of the taxes of the city, shall in any manner affect or impair the validity of any sale or other proceeding for their collection.* This charter shall be taken and held to be a full and sufficient notice of all acts and proceedings for the assessment, levying, and collecting of the taxes of the city of Memphis."

The taxing power is necessary to the life of all governments, but there are some limits even upon a sovereign

Malone v. Williams.

State. The assessment is the foundation of the claim of the government, whether it be of the State or of a municipality, against the citizen, of the particular amount claimed by it as taxes against him for any year. A law providing that this sum shall be due no matter what error there may be in the assessment, is simply the means of placing the property of the citizen within the uncontrolled discretion of the persons who for the time being may wield the taxing power. It is therefore an instrumentality for taking the property of the citizen without due process of law, and is unconstitutional and void.

The next section complained of is section 7 of article 8. That section reads as follows:

"Sec. 7. Be it further enacted that the city, in taking appeals or prosecuting a writ of error in any judicial proceeding, shall give bond as required by law, but it is hereby released from the obligation of law to furnish security therefor. Every such bond shall be executed by the president in the name of the city and under the corporate seal thereof, and shall be taken in all courts of this State as a full and complete compliance with the law in such cases."

An act of the legislature embodying the substance of the foregoing section was held unconstitutional and void, as in violation of article 11, section 8, of the constitution as far back as the April term of this court in the year 1877. See *City of Memphis* v. *Fisher*, 9 Baxt.,

239.  The section above quoted must therefore be declared unconstitutional.

Objection is made to subsection 6 of section 1 of article 3.  This subsection provides that the municipal council shall "have exclusive power to license ferries and to regulate the same, and the landing thereof within the limits of the city, and to fix and prescribe the charges and fees for ferries."

For the defendants it is insisted that it is customary everywhere to grant such rights to municipal corporations.  Such seems to be the rule in England and in some of our States. 1 Dillon on Munic. Corp. (3 Ed.), sections 114, 115, 116.  In this State, however, there is a different rule.  No authority is given in the constitution for the delegation of such rights to municipal corporations.  The power of delegation is to be found in article 11, section 9, which reads:  "The legislature shall have the right to vest such powers in the courts of justice, with regard to private and local affairs, as may be expedient."  This same provision is found in the constitution of 1834, article 11, section 8.  Prior to the last-mentioned constitution the power had been delegated to the county court. *Corporation of Memphis* v. *John Overton,* 3 Yerg., 387. We do not find anything in that case, or in any prior case, setting forth the grounds of this grant.  However, since the constitution of 1834, and of 1870, went into effect, the power to delegate has been ascribed to the section which we have quoted; or at least the power must be found to reside there.  See *Guinn* v. *Eaves,* 117

Tenn., 524, 101 S. W., 1154, and cases therein cited. The power has been delegated to the county courts of the State, and statutes have been passed regulating the right. There is no authority in the constitution for the delegation of such powers to municipal corporations. The subsection quoted is therefore unconstitutional and void.

Objection is made to subsection 37 of article 3, and to sections 14, 15, and 22 of article 8.

Subsection 37 of article 3 provides that the municipal council shall have power "to locate and establish as many voting precincts in each ward as may be necessary to accommodate the voters therein, and to guard and protect the same, provided that a sufficient number of precincts be established in each ward so that they shall conform to any rule or regulation fixed by the county court for holding State or county elections.

Subsection 14 of article 8 reads: "That all special elections, not otherwise provided for, shall be held under such regulations as may be prescribed by ordinance."

Section 15 reads: "That subject to the constitution and laws of the State governing the city, provisions may be made by ordinance for the holding of any election for any lawful purpose, and for conducting the same and ascertaining and declaring the result thereof, and making a proper record to evidence the result."

Section 22 reads: "That in all municipal elections held under this charter the voters thereat shall have all the qualifications necessary to entitle them to vote for

118 Tenn—28

members of the general assembly, and must have resided for six months next preceding the election in the city of Memphis."

For the defendants it is insisted that the power delegated has reference solely to special franchise elections and not to general official elections. It is further insisted that the election law of 1897 (Acts 1897, p. 139, c. 16) construed in the case of *Gotten v. Gowen*, 113 Tenn., 175, 80 S. W., 1087, does not contemplate and make special provision for franchise elections such as are authorized by the act of March 27, 1907, under the head of franchises. It is further insisted that elections are an incidental matter and belong naturally to municipal life.

We think the learned counsel for the defendants incorrectly construe the provisions above quoted. Undoubtedly the purpose of these provisions was to place the whole matter of elections within the city of Memphis, both general and special, and of every nature, and for all purposes, in the municipal council. This is especially manifest from the language used in section 15 above quoted: "Provisions may be made by ordinance for the holding of any election for any lawful purpose, and for conducting the same and ascertaining and declaring the result thereof, and making a proper record to evidence the result."

It is no doubt true, as insisted for the defendants, that the matter of elections is incidental to corporate life,

Malone v. Williams.

and under proper limitations may be conferred in a charter. But the question here goes deeper. There is a general law of the State providing how elections shall be conducted in communities having a population of fifty thousand inhabitants or over according to the federal census of 1890, or that may have at any time thereafter fifty thousand inhabitants or over. This general statute (chapter 16, p. 139, Acts 1897) applies to all elections, State, county, and municipal, within the territorial designation above indicated. By this act it is made the duty of the commissioners of registration to appoint, prior to all elections held under the provisions of the act, three judges and two clerks and the officer or officers to hold such election, "to the exclusion of the sheriffs and coroner, or other officer or person heretofore possessing said power of appointment of elections in each ward and district, and voting precinct of the city or county to which this act applies; and the county court, mayors, and boards of mayor and aldermen and sheriffs in the counties and cities within the provisions of this act are hereby divested of the authority to appoint said officers, judges and clerks of said election. All three of the judges shall not be from the same political party, if persons from different political parties are willing to serve; and they shall be appointed from the two political parties most numerously represented in such ward or district. The two clerks shall be of different political parties, if competent persons of different political parties are willing to serve. The judges and clerks shall

be residents and citizens of the ward or district in which the voting places for which they are appointed are situated. They shall be appointed within sixty days prior to the election, and in due time to serve thereat." ·

It is further provided in the act referred to (the act of 1897) : "That it shall be the duty of the officer holding the election to deliver the polls or returns of the election sealed as received to the said commissioners of registration, not later than 12 o'clock m. on the first Monday after the election. On the first Monday after the election it shall be the duty of the commissioners of registration to compare the said polls or returns at the court house, and to certify, in writing, signed by at least two of them, the result as shown by said polls or returns, and to deliver said certificate to each person elected at said election."

It is further provided "that said commissioners of registration shall cause a true copy of all the polls or poll lists used at, or in, every regular November election to be made out, and when completed they shall file the same with the clerk of the county court to be preserved as records for the period of four years by him."

In the last section of the act it is provided: "That the duties imposed and the powers conferred herein upon the commissioners of registration shall apply to all national, State, county and municipal elections, and also to all special or called elections."

The city of Memphis falls within the provisions of the foregoing act, along with many other communities in the State, which fall within the classification made by

this act. No good reason can be conceived why the city of Memphis should be elevated above the other communities covered by the act, or depressed below those communities, as the case may be, and placed in a class by itself, whereby, in the use of the elective franchise, it is relieved of the burdens imposed upon other communities by the provisions of the act referred to, and of those acts which the latter act amends, or why its people should be deprived of the safeguards vouchsafed to other communities by the said act of 1897 and its congeners. Those provisions are both burdens upon the official agencies employed in the conduct of elections and benefits and safeguards to the people of the communities for which they were devised. The attempt to deprive the city of Memphis of the benefit of these provisions must be held void as in violation of article 1, section 8, of the constitution, and of article 11, section 8.

It is insisted that the various provisions which have been above declared unconstitutional along with certain other provisions now to be mentioned, constitute distinct subjects not embraced within the title of the act we have under consideration (the act of March 27, 1907) ; hence the act is void, as in violation of article 2, section 17, of the constitution of the State. The other provisions referred to in connection with the foregoing provisions declared unconstitutional are sections 37, 41, and 44 of article 5, relating to revenue and taxation. These sections contain several provisions which cover State and county taxes.

Article 2, section 17, so far as necessary to be quoted at this point, and so far as applicable to the inquiry above suggested, reads as follows: "No bill shall become a law which embraces more than one subject, that subject to be expressed in the title."

The decisions in this State construing and applying the provision of the constitution just quoted are very numerous. They are as follows: *State* v. *Hayes,* 116 Tenn., 40, 93 S. W., 98; *Memphis* v. *Hastings,* 113 Tenn., 142, 86 S. W., 609; *Arbuckle Bros.* v. *McCutchen,* 111 Tenn., 514, 77 S. W., 772; *Nichols & Shepherd Co.* v. *Loyd,* 111 Tenn., 145, 76 S. W., 911; *Saunders* v. *Savage,* 108 Tenn., 340, 67 S. W., 471; *Condon* v. *Maloney,* 108 Tenn., 82, 65 S. W., 871; *Carroll* v. *Alsup,* 107 Tenn., 257, 64 S. W., 193; *State* v. *McMinnville,* 106 Tenn., 384, 61 S. W., 785; *State, ex rel.,* v. *Banks,* 106 Tenn., 394, 61 S. W., 778; *State* v. *Hoskins,* 106 Tenn., 430, 61 S. W., 781; *State, ex rel.,* v. *Schlitz Brewing Co.,* 104 Tenn., 715, 59 S. W., 1033, 78 Am. St. Rep., 941; *State* v. *Brown,* 103 Tenn., 449, 53 S. W., 727; *State* v. *Bradt,* 103 Tenn., 584, 53 S. W., 942; *Ryan* v. *Terminal Co.,* 102 Tenn., 111, 50 S. W., 744, 45 L. R. A., 303; *Bank* v. *Divine Grocery Co.,* 97 Tenn., 603, 37 S. W., 390; *Powers* v. *McKenzie,* 90 Tenn., 167, 16 S. W., 559. The remaining cases upon the subject will be found stated, examined, and compared in *Hardaway* v. *Lilly* (Tenn. Chy. App., 1898), 48 S. W., 712.

It is insisted for defendants that, notwithstanding the above mentioned unconstitutional provisions, the

residue of the act may still be good, under the rule which holds that under some circumstances void or unconstitutional provisions of a statute may be eliminated and the residue may still stand. We have numerous cases in Tennessee upon this subject. They are: *Fite* v. *State*, 114 Tenn., 646, 88 S. W., 941, 1 L. R. A. (N. S.), 520; *State* v. *Trewhitt*, 113 Tenn., 561, 82 S. W., 480; *Lindsay* v. *Allen*, 112 Tenn., 637, 82 S. W., 171; *Weaver* v. *Davidson County*, 104 Tenn., 315, 334, 59 S. W., 1105; *Jones* v. *Memphis*, 101 Tenn., 188, 47 S. W., 138; *Austin* v. *State*, 101 Tenn., 563, 48 S. W., 305, 50 L. R. A., 478, 70 Am. St. Rep., 703; *Gribble* v. *Wilson*, 101 Tenn., 612; *State* v. *Cummins*, 99 Tenn., 682; *State* v. *Scott*, 98 Tenn., 256, 39 S. W., 1, 36 L. R. A., 461; *Reelfoot, etc., District* v. *Dawson*, 97 Tenn., 151, 36 S. W., 1041, 34 L. R. A., 725; *Dugger* v. *Ins. Co.*, 95 Tenn., 260, 261, 32 S. W., 5, 28 L. R. A., 796; *Burkholtz* v. *State*, 16 Lea, 71; *Ballentine* v. *Mayor, etc., of Pulaski*, 15 Lea, 633, 648; *Franklin County* v. *Railroad*, 12 Lea, 521, 531, 552; *State* v. *Wilson*, 12 Lea, 246, 254; *Tillman* v. *Cocke*, 9 Baxt., 429; *Neely* v. *State*, 4 Baxt., 174.

We shall postpone the determination of the questions thus suggested until we state the next phase of the inquiry in respect of the violation of article 2, section 17, of the constitution. That portion of section 17 of article 2 of the constitution involved in this latter phase reads as follows: "All acts which repeal, revive or amend former laws shall recite in their caption, or otherwise, the title or substance of the law repealed, revived or amended."

The title of the act under consideration is as follows:

"An act to modify and change in certain respects the form of government of the city of Memphis by abolishing certain municipal officers, departments, and agencies, and creating others; to alter and change some of its powers and to create others; to amend its existing charter or charters, or acts of the general assembly, under which it is organized and exists as a municipality, so as to continue its existence, with a more efficient form of government, and with powers altered and enlarged, so as to secure and promote better government and administration, and to amend an act entitled 'An act to establish taxing districts in the State and to provide the means of local government for the same,' being chapter 11, Acts of 1879, and all acts amendatory thereof; and also to amend chapter 54 of the Acts of 1905, entitled 'A bill to be entitled "An act to establish taxing districts in this State, and to provide the means of local goverment for the same,"' the same being chapter 11 of the Acts of 1879, and all acts amendatory thereof, constituting the charter of the city of Memphis; and to better and perfect the charter of said city of Memphis, created by the acts of assembly aforesaid."

Before entering into the particulars of the question, we shall state in outline the general contentions of the respective parties. For the complainants it is insisted that, while the caption purports an amendment, the body of the act shows a complete new scheme of legislation, covering the whole subject, and thereby displacing

the former acts composing the charter of the city of Memphis; in short, that, while the title purports simply an amendment of the former charter, the body of the act contains a new charter, and is therefore in conflict with the caption, and consequently makes the whole act void. For the defendants it is insisted that the amendatory purpose, not only appears in the caption, but in the preamble following the caption, and also in the body of the act, all through it; hence that the body of the act is in strict accord with the caption.

There are some general observations that we deem pertinent at this point, in the nature of a statement of the principles which should control the investigation.

In the first place, while the legislative history of an act may be looked to as throwing light upon its meaning and purpose, we do not think that any controlling importance can be attached to the fact that the bill in question was first introduced as an independent act, and then withdrawn and introduced as an amendatory act, for the purpose of avoiding the Pendleton law, and escaping the prohibition of the sale of intoxicating liquors in the city of Memphis. The purpose, whether laudable or reprehensible from a moral, social, or economic standpoint, was at all events a lawful one, and cannot greatly affect the question whether the act under examination can be considered and treated from the constitutional standpoint as an amendatory one.

In the second place, we deem it quite true that if the caption of an act shows that it was intended by the legis-

lature as an amendatory act, while the body shows it, in direct terms, or express terms, to be a repealing act, such act must be held void under the doctrine of *Murphy* v. *State,* 9 Lea, 373. If the caption of the act be of the kind referred to, and the body shows that it is a complete scheme of legislation intended to cover the whole field, here we would find, in the body of the act, what is commonly known as a "repeal by implication," and the question to be determined would be presented in an alternative aspect: First, either the whole act would be void; or, secondly, it would be good simply as a new and independent act. The solution of the alternative depends upon the construction and application of article 2, section 17, of the constitution, above quoted. Now, suppose the legislature, because not rightly comprehending the constitutional effect of what they are doing, place under a title purporting to amend a given statute matter which by construction of law is held to be an implied repeal of the law referred to; shall that render the act abortive? The purpose of the last clause of the constitutional provision above quoted is fully met in the case supposed by the recital of the act, to be dealt with afterwards, in the caption, and attention is thereby called to it. But is the public not misled, and deceived, when the purpose expressed in the caption is to amend the act referred to, while the actual thing effected in the body of the act, if its provisions be given a true interpretation, is a repeal of the prior legislation? It would seem so, and

thereby it would appear that the purpose of the prior clause of the constitution quoted—"No bill shall become a law which embraces more than one subject, that subject to be expressed in the title"—would be violated, since the true subject of the act would not be expressed in the title; that true subject, as expressed in the body of the act, being a repeal of the former statute, while the subject expressed in the title is an amendment.

We do not think the opinion of the legislature as to whether an act is an amendatory act, or a repealing act, is at all conclusive. The question is a judicial one, and it is the duty of the court to consider it from that standpoint alone, without further deference to the opinion of the legislature than is required by the well-known and universal rule that statutes must not be declared unconstitutional if it be possible by any reasonable construction to hold them valid; or, as applied to the case supposed, when the caption declares a purpose to amend an act referred to, the act must be sustained as an amendatory act, if this can be done by any reasonable construction. But suppose the "expressed intention," or that expressed in terms, is in conflict with the completed result as shown by the provisions of the act, which shall control? When the actual provisions show a repeal of prior acts, can the legislature nullify *the fact* by saying in terms, "This is an amendment, not a repeal?" Certainly not. The dominant intent must be held to be that which is shown by *the fact.* This is unmistakable. The other is illusory. Here we must dis-

tinguish between purpose and characterization. To determine the purpose we examine both the title and the body of the act. If they are found to be at cross-purposes—that is to say, if the title expresses one purpose and the body of the act shows a different one, the latter is not included in the former—, there is a conflict, and a violation of the constitution. The body of the act always shows the real thing done, the thing actually intended. It gives character to the act. By it we are to determine the designation or class under which the act falls; and this, as above stated, is a matter for judicial construction and determination.

We do not think that *Poe* v. *State,* 85 Tenn., 495, 3 S. W., 658, is at all opposed to the views above expressed, since it appears (page 500 of 85 Tenn., page 659 of 3 S. W.) that the court simply rejected as surplusage so much of the title of the act under examination in that case as referred to the matter of amendment, no particular statute being referred to, and held that the title of the act showed "an intent to legislate upon *the entire subject of concealed weapons,* and not a purpose to amend or repeal a particular provision only." It was thus treated as an independent act, covering the whole subject, and repealing by implication prior laws in conflict with it. However, if the matter rejected from the title in *Poe* v. *State,* had not been rejected, the act there under examination must have been held unconstitutional, as shown by the later case of *Shelton* v. *State,* 96 Tenn., 521, 32 S. W., 967.

Malone v. Williams.

Nor is there any doubt under our decisions that, if the subsequent act contains a full scheme of legislation upon the subject which it covers, it operates as a repeal of prior acts on the same subject (*Erwin* v. *State,* 116 Tenn., 71, 89, 90 et seq., 93 S. W., 73), and there is no place for the theory advanced by defendants' counsel that after such repeal there is still left in the former corporation a spark of life, or that it is still a legal entity under its former incorporation, and is merely fanned into a larger life by the subsequent legislation. The result of the repeal of the charter, where there is in fact a repeal, is a complete legal extinction; there is no legal entity left. *Erwin* v. *State,* 116 Tenn., 91, 92, et seq., 93 S. W., 73; *Brinkley* v. *State,* 108 Tenn., 475, 67 S. W., 796. In the latter case it was said: "A municipal charter is not only the measure of corporate powers, but is also the beginning and the end of corporate life; and that life is a distinct, indivisible thing. When a charter is completely granted, a distinct corporate entity comes into being; and when the charter is completely surrendered, the corporate entity ceases to exist. So the life of the old town of McMinnville, as a distinct legal entity, began when the old charter was granted, and the life of that town ceased when that charter was surrendered. The change was not a mere amendment of the old charter, a simple transmutation of the existing corporate entity, but an entirely different thing. The legal result was twofold: (1) There was an absolute extinguishment of one corporate entity, and (2) the original

establishment of another one. Although subject to the contracts of the old corporation (Acts 1875, p. 143, c. 92, section 14, proviso), this new charter was, in contemplation of law, the inception of a new municipality, the beginning of a new and distinct corporate existence; and, having been incorporated after the passage of the act of 1899 (Acts 1899, p. 474, c. 221) with a population of only 1,980 by the federal census of 1890, this new municipality was from the start subject to the provisions of the four-mile law as amended by that act." There is nothing in *Cooper* v. *Town of Shelbyville* (Tenn. Ch. App), 57 S. W., 429, in conflict with what has just been said. On the contrary, that case is in full accord. See specially, pages 434 and 442.

We may add that the following quotation, appearing in the brief of defendants' counsel, taken from Thompson's Commentaries on the Law of Corporations (volume 1, section 623), is good law, viz.: "The test by which to determine whether a particular subject can be embraced within the title, 'An act to amend' a former act, is to consider whether the subject could have been embraced within the original act under its title. 'If, under the original title of the act incorporating the company, it would have been proper to confer upon the corporation the powers contained in the amendment, then there can be no doubt of the power to confer them upon it by way of amendment of such act, and under the title of 'An act to amend' the original act, reciting its title. Any additional powers may be given to the

company under an amendatory act which could have been constitutionally conferred under the original act." This is substantially the rule laid down in our own State. *Wright* v. *Cunningham,* 115 Tenn., 445, 91 S. W., 293; *Hyman* v. *State,* 87 Tenn., 109-111, 9 S. W., 372, 1 L. R. A., 497; *Goodbar* v. *Memphis,* 113 Tenn., 20, 81 S. W., 1061. This rule, however, is wholly aside from the question whether, under a caption to amend a prior act, a complete scheme of legislation may be set up which takes the place of the prior legislation. The inaccuracy of thought, it seems to us, in citing the rule referred to, arises from confusing the rules applying to amendments purely with that rule which declares that a complete new scheme of legislation does not amend an old act upon the same subject, but displaces and repeals it. Similarly, the doctrine referred to by defendants' counsel, that repeals and amendments by implication do not fall within the provisions of article 2, section 17, of the constitution, simply means that they may be effective without referring to the prior act or acts incidently affected; that is, they are independent acts with collateral effects. This is a different question altogether from the one whether an act purporting on its face to be an amendatory act can in its body be a repealing act, either by direct words or by implication.

We shall now state in outline the powers and form of organization devolved upon the city by the act in question. We cannot give these in detail, because of the

great length of the act, covering, as it does, seventy-five long, closely printed pages.

The powers given are:

"To have perpetual succession; to sue and be sued; to implead and be impleaded, defend and be defended, in any courts of law or equity in all actions whatsoever, except as hereafter provided in article —, section 28 of this act; and that it may make and use a corporate seal, and alter same at pleasure, may acquire and hold any gift, devise, purchase, or by condemnation proceedings, lands or other property for public use, either within the corporate boundaries of said city, or beyond the limits of said city, for waterworks to supply the city and its inhabitants with water; for gas works and other works and plants for supplying the city and its inhabitants with light, heat and power, or any of them; for public parks, cemeteries, penal and charitable institutions or any of them; for hospitals, markets, wharves, engine houses, fire stations, depots, rights of way for sewers, conduits, pipe lines, pole lines, viaducts, bridges, tunnels, subways or for the exercise of the powers herein granted, and that hereafter may be granted, or for any other public purpose.

"That it may take, hold, use and improve any property, real personal or mixed, either within or without the city limits that may be acquired by purchase, gift, devise, bequest or otherwise, and for any charitable use or educational, benevolent or public purpose whatsoever, and may do all that is necessary to carry out the pur-

Malone v. Williams.

pose of such gifts, bequests or devises, and may sell, lease or otherwise dispose of any property, real, personal or mixed of the city, and any contract rights of the city, subject to the restrictions imposed by this charter or the constitution of the State;

"That it may lay out, open, extend, widen, improve, maintain or vacate streets and alleys, sidewalks and crossings and all public highways, and regulate the use of same;

"That it may construct and maintain sewers, drains and all works necessary for the disposition of sewage;

"That it may erect, construct and maintain public buildings and public works, and may lay out and maintain public parks and cemeteries;

"That it may establish and maintain public schools, public libraries, reading rooms and penal and charitable institutions;

"That it may exercise the powers of eminent domain and taxation, and may by amendment of this charter extend its limits as defined herein so as to include new and additional territory;

"That it may protect the property of the city, and the lives and property of its inhabitants from floods and inundations and the danger thereof; and

"That it may exercise all municipal power necessary, or which may be deemed expedient for the complete and efficient management and control of the municipal property and administration of the municipal government and necessary to maintain the public peace, protect

118 Tenn—29

property and promote the public welfare and preserve the health of the inhabitants of the city, whether such powers be expressly enumerated herein or not; and may have and exercise within the city limits, and for two miles outside thereof, all governmental powers, and police powers, subject to the limitations prescribed by the constitution and laws of the State and of the United States."

The foregoing provisions are contained in article 1 of the act.

Article 2 vests the legislative functions of the city in the municipal council, to consist of a president, vice president, and three commissioners, and prescribes their qualifications and fixes their salary, prescribes what a quorum shall be, that the vote of a majority shall be necessary to pass ordinances, and indicates certain disqualifications to deal with the city in any other capacity, and contains provisions with respect to the meetings of the council.

Article 3 provides that all powers "conferred upon the city by the charter shall be exercised by ordinance, except as otherwise provided in this charter." It further provides that the president and municipal council shall have power by ordinance to provide for the management and control of the finances and of all the property belonging to the city, and to appropriate money and provide for the payment of all debts and expenses of the city, to acquire property for the city by purchase or gift, to sell property for the city, to make contracts, to levy taxes, to license occupations and impose taxes there-

on (specifying several hundred). Following the list of occupations and businesses occurs this general clause: "The foregoing enumerations of powers shall be construed as in explanation and not in limitation of the general powers herein granted, and the municipal council shall have power to license, tax, and regulate all trades, professions, pursuits or employments not hereinbefore enumerated, of whatever name or character, like or unlike, and fix the amount of license tax to be paid thereon."

The act then proceeds to specify the powers to license, tax, and regulate hackmen, draymen; etc., and to license and regulate ferries; and to prescribe the time for which the licenses shall run and the fee to be charged therefor. It then gives power to remove and prevent all obstructions in the Mississippi and Wolf rivers within the city, and to improve and preserve the navigation thereof, and to erect, repair, and regulate wharves and docks, and to regulate the rates of wharfage within the limits of the city. It then specifies the power to provide the city with water, to make, regulate, and establish public wells, pumps, cisterns, hydrants, and reservoirs in or under the streets, within the city or beyond the limits thereof, for the extinguishment of fires and the convenience of the inhabitants, and to prevent the unnecessary waste of water. It next specifies the power to provide for lighting the streets and erecting lamps thereon, and to regulate and fix the price and quality of gas, gasoline,

electricity, or other means of lighting, and the manner and means of lighting by electricity, and the power thereof, and to compel any gas or electric light company, corporation, or individual to change and relocate any gas mains and pipes, or any poles or conduits for electric wires.

Then follow in due order full provisions with respect to streets, sewers, steam railroads, bridges, culverts, public buildings, inspection of food, inspection of weights and measures, and numerous classes of merchandise; provisions concerning the public health and public morals, theaters, and places of public amusement; the establishment of fire limits, and the prevention and removal of public nuisances; provisions for the preservation of public order, public safety, and public convenience, and the establishment of prisons and charitable institutions.

Power is also given "to establish the salaries and duties of all officers and the compensation and duties of all employees in all cases not provided for in this charter." Then follows this general clause: "The foregoing enumeration of particular powers granted to the municipal council in this charter shall not be construed to impair any general grant of powers herein, or in this charter contained, nor to limit any such general grant of powers of the same class or classes as those enumerated; and the municipal council shall have power to pass, publish and amend and repeal all such ordinances, rules and regulations not inconsistent with the provisions

of this charter or contrary to the laws of this State or of the United States as it may deem expedient or necessary in maintaining the peace, order or good government, health and welfare of the city, its trade, commerce, manufactures, or that may be necessary or proper to carry into effect the provisions of this charter."

Next the municipal council is given power to impose and collect fines, forfeitures, and penalties. It is required to make out a budget for each department as far as may be practicable. Provisions are also made concerning the style of ordinances and the method of their passage, together with the amending, reviving, and filing of ordinances. Power is also given to impose duties upon abutting property owners in respect of sidewalks and streets fronting or adjoining their property.

Article 4 prescribes the duties of the president and vice president, and gives the municipal council "power to appoint all city officers not designated by this charter to be elected by the people or otherwise elected or appointed, and to fill by appointment all vacancies occurring in such offices; also for just cause to suspend and remove the incumbents of any such office."

This article provides for a city clerk, city assessor, judge of the corporation court, clerk of that court, comptroller of the city, treasurer, city counselor, assistant city counselor, stenographer for the city counselor, city clerk, and prescribes the duties of each.

Section 26 of this article provides "that all appointed officers whose positions are created by charter or ordi-

nance, not appointed by the governor or elected by the people, shall hold their offices and continue in the service of the city, subject to the will and pleasure of the council."

Article 5 is entitled "Revenue—Taxation," and contains fifty-five sections, embracing numerous and minute provisions upon these subjects.

Article 6 is entitled "Franchises," and contains full provisions upon this subject.

Article 7 is entitled "Department of Parks and Boulevards," and contains minute provisions upon these subjects.

Article 8 is entitled "Miscellaneous Provisions." Herein are found directions concerning city improvement, fire patrol and salvage corps, official bonds, further provisions with regard to ordinances, and provisions with regard to city elections.

With regard to ordinances the following occurs in section 18: "That the municipal council shall have the power to pass all ordinances not inconsistent with this charter or the constitution and laws of the State, which it may deem necessary or expedient to more fully carry out any provision in this charter contained."

The next section reads: "That this charter is declared to be a public act, and may be read in evidence in all courts of this State without proof."

The following sections of article 8 are referred to by counsel for complainants as being without meaning, unless the purpose of the legislature was to create

a new charter, and unless the act was understood by that body to be really a new charter for the city. These provisions are as follows:

"Section 1.   Be it further enacted, that all ordinances, regulations and resolutions in force at the time this charter takes effect, and not inconsistent therewith, shall remain and continue in force until altered, modified or repealed by the municipal council.

"Sec. 2.   Be it further enacted, that all measures and proceedings pending or under consideration in the legislative council at the time this charter takes effect, and not inconsistent with the provisions thereof, shall remain unaffected by this charter, and may be acted upon and disposed of as if they had originated under this charter.

"Sec. 3. Be it further enacted, that all rights of action, fines, penalties, and forfeitures accrued to the city before this charter takes effect, shall remain unaffected thereby and may be prosecuted and recovered in every respect as fully as if this charter had not taken effect."

"Sec. 5.   Be it further enacted, that all recognizances, obligations, and all other instruments entered into or executed by or to the city before this charter takes effect, and all taxes, fines, forfeitures and penalties due or owing to the city, and all writs, prosecutions, actions and causes of action, except as herein otherwise provided, shall continue and remain unaffected by this charter."

"Sec. 21.   Be it further enacted, that the privilege taxes as now fixed by law shall remain and continue

until changed by ordinance, and the municipal council may from time to time, by ordinance, fix all taxes or privileges."

The following sections of article 8 are also specially referred to:

"Sec. 8. Be it further enacted, that all offices existing under the act entitled 'An act to establish taxing districts in this State, and to provide the means of local government for the same,' being chapter 11 of the Acts of 1879, and all the acts amendatory thereof, constituting the charter of the city of Memphis, are hereby vacated and abolished."

"Sec. 24. Be it further enacted, that all offices created by chapter 54 of the Acts of Assembly of 1905, be, and they are hereby, abolished and vacated, and the present occupants or incumbents thereof shall cease to exercise the powers, duties and functions thereof, or exercise any authority or perform any duties whatsoever as officers of said municipal corporation; that the municipal council shall, as soon as practicable, organize all new departments created by this act or by the municipal council under the authority of the charter of the city of Memphis, and reorganize all other departments of the city government, and to that end all offices in each and every department heretofore created and existing are hereby made vacant, and the said municipal council shall make appointments to fill said vacancies, and shall make appointments to fill the departments of said government."

It is insisted for complainants that the foregoing

shows a complete, independent scheme of legislation, creating a new charter for the city of Memphis, with a full corps of officers, sufficient to support the new framework and with power in these officers to appoint all others that may from time to time be needed; that under sections 8 and 24, above quoted, of article 8 all of the offices existing under the former charter were abolished; and that sections 1, 2, 3, 5, and 21 of article 8 were wholly unnecessary and wholly unmeaning unless a new charter was intended, and if this was the intention that these sections were pertinent and proper. It is also pointed out that the act speaks of itself more than fifty times as "this charter," and contains numerous expressions, such as, "when this charter shall go into effect." It is also urged that the frame of government under the present act is antagonistic to that created under chapter 11, p. 15, of the Acts of 1879, and its amendments; that under the act of 1879 the municipal government was divided into legislative, executive, and judicial departments, and a system of checks and balances was provided; that the legislative department consisted of two branches or boards, and no contract could be entered into by the city of Memphis without the consent of a majority of each of said boards; and that the power of taxation was limited; that the new act is radically different, for that, instead of separate legislative and executive departments, with a system of checks and balances and limitations of the taxing power provided by the former acts, the new act vests in five

commissioners, or rather a majority thereof, all legis-
lative, executive, taxing, and police powers; that un-
der the old acts the legislative department consisted
of two chambers, while under this act there is only one
chamber—a commission, clothed with unlimited power;
that under the old act and the amendments thereto the
mayor and the board of fire and police commissioners
and the board of public works constituted the govern-
ment, while under the new act the various departments
are divided up among the commissioners, each of the
five being authorized to acquire control of one depart-
ment; that under the old law a certain amount was
required to be apportioned to each department, which
was restricted to the amount so set apart to it, while
under the new act there is no such wise restriction,
but the matter is left to the discretion of the five com-
missioners; that under the former acts the officials
were placed under heavy bonds for the faithful per-
formance of their duties, but under the new act, while
bonds are required for some officers, none are required
to be given by the commissioners; that under the old
law the number of officers was designated and their
salaries fixed, while under the new act the commission-
ers have power to establish offices and agencies of gov-
ernment without limit, and to fix their salaries; that
under the old law the discharge of officers and em-
ployees was regulated by special provisions, while under
the new act the power to discharge, even without a
hearing, is unrestricted; that under the old act the

assessment of taxes was governed by conservative rules to protect the citizens, and a limit was set beyond which the city could not go, while under the new act the commissioners, who are under no bonds, are given absolute power over all assessments, and there is no limit whatever to the amount which can be levied in the way of special taxes; that under the old act the city could exercise police power for sanitary purposes within a narrow area outside of the corporate limits of the city, while the new act confers on the commissioners all governmental as well as police powers for two miles outside of the city limits, and they may exercise certain police powers for ten miles beyond the city.

It is insisted that there is thus made to appear a very radical difference, not only between the two forms of government, but also in the nature, extent, and distribution of the powers of municipal government; that they cannot be united into one consistent whole; that there is an irreconcilable repugnancy; that the new act contains provisions which are absolutely destructive of the old form of government.

For the defendants it is insisted that the language of the new act shows that it is an amendatory and not an original act; that the form of government is not substantially different from that which existed under the old acts; that under both acts, the old and the new, the government was and is one by commissioners; that originally the form of government was one-chambered, and was subsequently made two-chambered or bi-cameral

by chapter 54, p. 99, of the Acts of 1905; that the present act goes back to the original idea; that the city itself had under the former act substantially the same powers as those embraced in the present act, save the delegating of such additional powers as modern and progressive municipalities possess; that the provisions upon the subject of revenue· and taxation, franchises, parks, and boulevards are all embraced within the original acts and their amendments, the present act simply providing broader regulations and stronger safeguards; that it is a misconstruction of the act to say that it expressly abolishes every office, agency, and instrumentality of the government existing under the former acts which it purported to amend; that it did not abolish the board of health, a separate and distinct instrumentality and agency of government; that it did not abolish the water department, the. engineering department, the park and boulevard department, and the street commissioners' department; that the abolishment of all the offices would not abolish these departments; that provision is made in section 24 for the reorganization of these departments.

It is true, as insisted by defendants' counsel, that under the original act the legislative body was single, although it was composed of the members who made up the board of fire and police commissioners and the board of public works, and that the change from one to two chambers was made by chapter 54, p. 99, of the Acts of 1905. The other statements, however, made by com-

Malone v. Williams.

plainants' counsel as to the difference between the two systems of government, are substantially correct. However, we do not think this feature of the case is very material; there are both correspondencies and divergencies.

We do not see, however, the force of the contention, offered by defendants' counsel, that the several departments referred to by them as existing can be said really to exist, otherwise than as abstractions, if all the offices formerly existing under the act of 1879 and its amendments are abolished. There may be a department of ' government without an officer filling it; but there must be an office, or function attached to it, to be filled by one or more persons on whom its duties and responsibilities may be devolved. The office or function is a concrete expression of the potential activities of the department. If there be such an office without an incumbent, this is a case of vacancy to be filled by appointment or election; but, if there is no office at all, the supposed department is a mere inert ideality, simply a form of words, a thing without substance.

The theory suggested in the chancellor's opinion filed as a part of defendant's brief, that section 24 of article 8 merely abolished the officers, leaving the offices standing, is wholly inadmissible. An office is a species of property, and the legislature cannot constitutionally legislate an officer out of that property while leaving the office with its duties unimpaired. This would be taking the property of the citizen without due process

of law, in violation of article 1, section 8, of the constitution. The legislature can, indeed, abolish any office, if there be no constitutional restriction in the way, and thereby abrogate the duties attached, and as an incident thereto the rights of the officer cease, since there is nothing to which they can attach. But, as already stated, it cannot leave the office standing and abolish the officer. His property interest consists in his right to discharge the duties of the office and to take its emoluments so long as the office exists and the term continues. Of course, where under the terms of the grant the officer is removable at pleasure, a different result follows; but this feature does not occur in respect of the officers referred to in sections 8 and 24 of article 8 of the act of March 27, 1907.

Looking back over the provisions of the act of 1907, it seems difficult to reach any other conclusion than that it was intended as a complete scheme of legislation, covering the whole ground; that the body of it shows all through that it was intended as a new charter; that for this reason it is spoken of therein more than fifty times as a charter; and for the same reason that in sections 1, 2, 3, 5, and 21 of article 8 special provisions were made for the preservation of ordinances, proceedings, and rights that would perish with a new charter, if not preserved by special provisions.

The inferences to be thus drawn are opposed by the language of the caption, by the preamble, and by some amendatory words appearing in section 1 of article 1.

But, as we have already said, when the body of the act discloses a different purpose from the caption, there is a variance; and it is held the body may be examined to ascertain whether it discloses an independent scheme of legislation, as contradistinguished from the amendatory purpose disclosed in the caption.

A similar question of construction was presented in the case of *Murphy* v. *Utter*, 186 U. S., 104, 22 Sup. Ct., 776, 46 L. Ed., 1070. In that case it appeared that on June 25, 1890, congress passed an act providing that a certain funding act of the territory of Arizona "be, and is hereby, amended, so as to read as follows; and that as amended, the same is hereby approved and confirmed, subject to future territorial legislation." Considering the matter thus presented, the court said:

"The first question to be considered is as to the relation of these two acts. Is the act of congress to be considered as an amendment or a repeal of the territorial act? It is true the preamble speaks of the territorial act as being amended, and, as amended, approved and confirmed. But the language is not that of an amending act, but that of a repealed and substituted act. No attention is called to the amendments, which are not even introduced in brackets, and a careful reading and comparison of the two acts are required to discover where and how the territorial act is amended. It stands as an original piece of legislation, although its different sections contain the numbers taken from the revised statutes of Arizona, as well as from the

original act of 1887. Both acts are complete in themselves and each is, upon its face, independent of the other. It is impossible to say that, if the territorial act were repealed, the act of congress passed three years later would also fail in consequence thereof, because the latter is not only the later, but the paramount, act. They must either stand together as two independent pieces of legislation, or the general, and perhaps the sounder, rule stated in *United States* v. *Tynen,* 11 Wall. (U. S.), 88, 20 L. Ed., 153, be applied, that where there are two. acts on the same subject, and the latter embraces all the provisions of the first, and also a new provision, and imposes different or additional penalties, the latter act operates, without any repealing clause, as a repeal of the first. In that case the defendant was indicted under an act passed in 1813 for uttering and counterfeiting a certificate of citizenship, purporting to have been issued by a California court. Upon a demurrer being filed to the indictment the judges differed in opinion, and the case was sent to this court, upon a certificate of division. While pending here, in 1870, congress passed another act embracing the whole subject of fraud against the naturalization laws, including all the acts mentioned in the law of 1813, and many others. It was held that the act of 1870 operated as a repeal of the act of 1813, and that all criminal proceedings taken under the former act failed, and that, even where two acts are not, in express terms, repugnant, yet if the latter covers the whole subject of the

first, and embraces new provisions plainly showing that it was intended to be a substitute for the first act, it will operate as a repeal of that act."

In the present case we are of the opinion that the body of the act purports a new charter for the city of Memphis, covers the whole subject, and therefore really purports a repeal of the prior charter; that the caption of the act and the body of it are in conflict; that the body of the act does not fall within the caption; that the act is therefore in violation of article 2, section 17, of the constitution, and is void.

The same conclusion is reached when we consider the case from the standpoint of the several provisions of the act found to be unconstitutional. The question is here presented in a double aspect. The first inquiry is whether the residue of an act can be held good after one or more sections or provisions have been elided as unconstitutional; and, secondly, whether such elided provisions present subjects not contained within the title, and hence rendering the act void as being in violation of article 2 of section 17 of the constitution.

In 1 Lewis' Sutherland on Statutory Construction, p. 583, it is said: "In determining whether part of an act can stand where another part has been held unconstitutional, a different rule as to presumptions is recognized from that which obtains where the whole act is to be considered. The general rule that legislative acts are primarily presumed to be constitutional, and that all

118 Tenn—30 .

intendments are to be made in favor of the act that will give it effect according to the intent of the lawmaking power, does not apply in such cases, as the upholding of part of an act is not favored; and where a part has been held unconstitutional, and the remaining portion comes up for consideration as to whether it can stand as an independent proposition, the presumptions are generally against it, and it will not be sustained unless that which remains is complete in itself and capable of being executed in accordanec with the apparent legislative intent, wholly independent of that which was rejected."

The portions of the act of March 27, 1907, which have been rejected as in themselves unconstitutional, are not so merely incidental and subordinate that they can be stricken out without in any sense impairing the efficiency of the act (*State, ex rel.,* v. *Trewhitt,* supra), and they are so numerous that we cannot say that the legislature would have passed the act with these left out. The act must therefore, likewise, fall upon this ground, without regard to the question whether any of the excluded provisions referred to · present subjects not embraced in the title. It is clear, however, that one of the subjects embraced within an excluded section includes matter not falling within the title; that is, one including State and county revenue, which is a subject that could not properly be embraced under a title purporting to legislate for a city. *Mayor and Aldermen of Knoxville* v. *Lewis,* 12 Lea, 180. The section upon

the subject of ferries also presents a matter not within the title; likewise, the extraordinary personal powers given the president or mayor within the radius of ten miles beyond the city limits.

Before closing the opinion we wish to recur to a subject briefly touched upon on a preceding page; that is, upon the supposed power of the legislature to remove officers of a municipality without abolishing their offices.

In the case of *Memphis* v. *Woodward,* 12 Heisk., 499, 501, 27 Am. Rep., 750, the case of *Wammack* v. *Hollaway,* 2 Ala., 33, was cited approvingly, wherein it was said: "An office is as much a species of property as anything which is capable of being held or owned, and to deprive one of it, or unjustly withhold it, is an injury which the law can redress in a manner as ample as it can any other wrong." In the same case the chief justice said: "The right to exercise a public office is a species of property, equally with any other thing capable of possession, and the law affords adequate redress when the enjoyment of it is wrongfully prevented. 3 Kent, 454; *Wammack* v. *Hollaway,* 2 Ala. (N. S.), 31. The same doctrine is recognized in *Dodd* v. *Weaver,* 2 Sneed, 670. But the right to the office does not entitle the officer to the compensation as under a contract. He takes it subject to the authority of the creating power to modify the compensation or to discontinue the office. *Haynes* v. *State,* 3 Humph., 480, 39 Am. Dec., 189; *Hoke* v. *Henderson,* 15 N. C., 1, 25 Am. Dec., 677. With this quali-

fication the officer is entitled to the office, and to its
emoluments, and to redress for interference with his
rights."

In *Dodd* v. *Weaver,* 2 Sneed, 670, the court said:
"An office is an incorporeal right, and consists in the
right to execute a public trust, and to take the emolu-
ments belonging to it." In *Moore* v. *Sharp,* 98 Tenn.,
68, 38 S. W., 411, it was said: "As to the nature of
the subject in contest, the office is an incorporeal right,
and it consists in the right to execute a public trust
and to take the emoluments belonging to it. 3 Kent's
Commentaries, 362. Now, if the county court erroneous-
ly decided against the person entitled to the office, it
was an injury to a private right for which there ought
to be a remedy." In *Nelson* v. *Sneed,* 112 Tenn., 48,
83 S. W., 788, it is said: "The right to hold an office,
and receive and enjoy its emoluments, and exercise its
functions, is an incorporeal right." In *Maloney* v. *Col-
lier,* 112 Tenn., 100, 83 S. W., 672, it is said: "An office
is an incorporeal right, and consists in the right to ex-
ecute a public trust and to take the emoluments belong-
ing to it, and an injury to this right is an injury to
a private right for which there ought to be a remedy."

In the case of *Hoke* v. *Henderson,* 15 N. C., 1, 25 Am.
Dec., 677, cited in the case of *Memphis* v. *Woodward,*
supra, after admitting that the legislature might abolish
offices or reduce emoluments, the court continued:

"Yet it is quite a different proposition that, although
the office be continued, the officer may be discharged

Malone v. Williams.

at pleasure, and his office given to another. The office may also be abolished, because the legislature esteem it unnecessary. The common weal is promoted by that law; at least, it is the apparent object, and must be deemed to be the real one. But, while the office remains, it is not possible that the public interest can be concerned in the question who performs the services incident to it. The sole concern of the community is that they should be performed, and well performed, by somebody. That they should be done by one particular person more than by another is not, therefore, a matter of expediency in any sense; and hence it cannot be the subject of legislation that one man, who has the faith of the public pledged to him that he should have the employment for a certain·term, and who has, upon that faith, entered upon the employment and faithfully executed it, should be deprived of it, and supplanted by another man, who is to do and can do the community no other services than those already in·the course of performance by the former."

The conclusion that an office could not be taken from one man and given to another by legislation was based upon the ground that this would be a judicial determination. The court said:

"It does not follow, therefore, that because the British Parliament, whose supremacy is acknowledged, decides questions of private rights and puts that decision, as it does its other determinations, in the form of a statute, that whatever it does is legislative in its nature. It

can adjudicate, and often does substantially adjudicate, when it professes to enact new laws. That faculty is expressly denied to our legislature, as much as legislation is denied to our judiciary. Whenever an act of the assembly, therefore, is a decision of titles between individuals or classes of individuals, although it may purport to be the introduction of a new rule of title, it is essentially a judgment against the old claim of right, which is not a legislative, but a judicial, function. It may not be easy to distinguish these powers, and to define each, so that an act shall be seen at once to be referable to the one or the other. But I think that where a right of property is acknowledged to have been in one person at one time, and is held to cease in him and to exist in another, whatever may be the origin of the new right in the latter, the destruction of the old one in the former is by sentence. If the act of 1832 had been confined in its terms to the clerkship of Lincoln, its judicial character would be obvious. If it had said that Mr. Henderson had forfeited his office, or had conveyed it to Mr. Hoke, or that after forfeiture Mr. Hoke had been duly appointed, or had been elected by the citizens and was appointed by the legislature, it would be plainly, as respects Mr. Henderson's title, an adjudication against it, although the subsequent investment of the title in Mr. Hoke would be legislative. Is the act the less of the former character because it does not recite an abuse by Henderson, or other cause of forfeiture? Is not such forfeiture as-

sumed in it? For it is impossible in the nature of things that Mr. Hoke can be rightfully put in, unless the other be rightfully put out."

In the case of *State Prison, etc.,* v. *Day,* 124 N. C., 362, 32 S. E., 748, 46 L. R. A., 295, Throop on Public Officers, section 20, is quoted with approval as follows:

"Nor can the legislature take from the officer the substance of the office, and transfer it to another, to be appointed in a different manner, and to hold by a different tenure, although the name of the office is changed, or the office divided, and the duties assigned to two or more officers under different names."

In that case the question which the court had under consideration arose out of the fact that the legislature had attempted to abolish the office of superintendent of prisons and to create a board of directors of three to perform the same duties. In addressing itself to the question thus presented, the court said:

"No function or duty that was formerly performed or imposed upon the superintendent is abolished. The functions and duties of that office are still necessary to the public welfare. They have not been abolished. They have simply been transferred to others. That cannot be done according to the law of the land. That three of the directors have been made the governing head of the institution, under the name of 'Executive Board,' and that to them the duties and functions of the office of superintendent have been transferred, does not change the application of the law. It is the same as

if the duties of the office had been transferred to one person. It is not a valid argument to contend that the executive board can conduct a State's prison in a better and more satisfactory manner than can one man. It may be true in point of fact, and that plan can be tried at the end of the defendant's term of office."

In a concurring opinion delivered in the same case by Furches, J., it is said:

"That case [*Hoke* v. *Henderson*], and every case since that case, discussing the right of an incumbent to hold his office, recognizes the right of the legislature to abolish a legislative office, and that, when the office is abolished, the right of the incumbent to hold it is gone, because there is no office to hold. But all the reported cases from *Hoke* v. *Henderson*, down to and including *State* v. *Bellamy*, 120 N. C., 212, 27 S. E., 113, hold that, to have the effect of ousting the incumbent before his term expires, the office must be abolished; that it is not sufficient to declare that it is abolished when it is not abolished; that the office is intangible, and consists in the duties of the office, and while those duties are continued the office is continued. The discussion then comes down to this: Are the duties of the office which defendant held abolished, or are they transferred to others?"

In the case of *Wood* v. *Bellamy*, 27 S. E., 113, 120 N. C., 212, it appeared that the legislature of North Carolina in express terms essayed to abolish the offices of superintendent and directors of the hospital, purport-

ing to create new corporations, and declaring that it was not the intention of that body to constitute the trustees and other agencies of the corporation officers; but the supreme court of that State held that the abolition of the offices was only nominal, that the functions and powers of the incumbents were substantially unchanged, and they could not be deprived of their constitutional right to exercise the duties, functions, and powers of their offices until the end of their terms. The court said:

"But the plaintiffs further contend that because the act declares that the offices of superintendents of the old corporations are abolished, and the offices of principal and resident physician substituted therefor (the latter elected for four years, instead of six, as was the superintendent), and because the government of the new corporation shall be under the management of nine trustees, called the 'Board of Trustees,' elected for a term of four years, instead of in classes of three for six years, the terms expiring at different times, as under the Code, and called the 'Board of Directors,' the officers under the old corporation are abolished, and the new ones take their places. This contention cannot be sustained. The legislature of 1870-71, upon the return to power of one of the political parties, undertook to remove the officers of a North Carolina institution for the deaf, dumb, and blind, who were of another political faith, and in the act for that purpose (chapter 35, p. 38) resorted to this same device of changing the name of

the offices to carry out their purpose. That act (1870-71) called the new board which it created the 'Board of Trustees,' in substitution of the old board, which was called the 'Board of Directors,' and used the very word used in the act of 1897, 'abolished.' It declared that the board of directors should be abolished, and the powers, rights, and duties heretofore prescribed by law to said board shall hereafter be granted to and imposed upon the board of trustees. It seems that the new board (called the 'Board of Trustees') took possession of the property and affairs of the corporation; but upon an action being commenced by the old board of directors against the board of trustees, and brought to this court on appeal, it was held that the legislative appointment was invalid, and that the title to the offices was in the old board of directors. It was also held that the legislature had the right to change the name of the board by which the institution was governed from the board of directors to that of the board of trustees, but in doing so it left the board the office to be filled by officers. *Nichols* v. *McKee,* 68 N. C., 429. The act did not, in fact, abolish the offices by changing the name of the board, although the act declared that the board of directors was abolished. The offices were left as before, and the abolition of the board of directors was one of words only." *Wood* v. *Bellamy,* 27 S. E., 115, 116, 120 N. C., 212.

In disposing of a clause in the act by which the legislature undertook to interpret what they were doing,

to the effect that the new trustees were not intended to be created officers, the court said:

"Those places have been held to be offices, as we have declared in this opinion, and the legislature, by simply declaring that they shall not be offices, does not change the nature of the thing. In the case of *Clark* v. *Stanley,* 66 N. C., 63, 8 Am. Rep., 488, Chief Justice Pearson, delivering the opinion of the court, defining what a public office is, said: 'A public office is an agency for the State, and the person whose duty it is to perform this agency is a public officer. The essence of it is the duty of performing an agency; that is, of doing some act or acts, or a series of acts, for the State.' It is as idle, under the decisions of this court, to say that such a position as these defendants hold is not an office, as it would be to say that a horse is not a horse, because one may choose to call him some other animal." *Wood* v. *Bellamy,* 120 N. C., 212, 27 S. E., 116.

Concluding, the court said:

"The effect of the act, then, is that it has only a prospective operation as to the change of the name of the institution, and the name of the offices connected with it, and that the defendants (the incumbents) are entitled to hold onto their offices, the defendant Kirby for the term for which he was elected, and the other defendants for the terms for which they were appointed, and until their successors are duly elected or appointed and qualified." *Wood* v. *Bellamy,* 27 S. E., 117, 120 N. C., 212.

In *Silvey* v. *Boyle,* 20 Utah, 205, 57 Pac., 880, the relator was appointed captain of police of Ogden City. He discharged the duties of his office until February 15, 1898, when he was attempted to be discharged, pursuant to an ordinance passed by the council on January 31, 1898, which defendants claimed abolished the office. On February 7, 1898, another ordinance was passed and approved, which provided again for the office of captain of police. Thereupon, on Februry 11th, one S. T. Whittaker was appointed to the office. The only question presented and argued in the briefs of counsel was: "Did the ordinance of January 31, 1898, work an abolition of the office of captain of police?" In disposing of this question the court said:

"The power which created it (the office) had the right to abolish it at any time, and where the office is abolished the presumption prevails that the services which the discharged officer was wont to perform are no longer required by the public, and no implication injurious to the incumbent can arise because of this dismissal, and no explanation or defense can avail him; and therefore no charges in such event need be preferred. This court so held in *Heath* v. *Salt Lake City,* 16 Utah, 374, 52 Pac., 602.

"In the case at bar, however, it will be noticed that, within a few days of the passage of the ordinance which appellants claim abolished the office, another one was passed providing for the same office, that both ordinances were published on the same day, and that on the

day previous to the publication, another person was appointed to fill the office. This shows that before the ordinance which is claimed to have abolished the office could become operative, the same office was again created. . . . It is too clear for argument that the real purpose and design was, not to abolish the office, but to get rid of one incumbent to make room for another. The method pursued to effect the removal is not such as commends itself to a court of justice. An officer whose tenure is during good behavior, or who can only be removed for cause, cannot thus be legislated out of office. *People* v. *McAllister*, 10 Utah, 357, 37 Pac., 578; *Pratt* v. *Board*, 15 Utah, 1, 49 Pac., 747; *Heath* v. *Salt Lake City*, 16 Utah, 374, 52 Pac., 602; *Pratt* v. *Swann*, 16 Utah, 483, 52 Pac., 1092."

The same rule is laid down in Kentucky. In *Adams* v. *Roberts* it is said:

"Though the legislature is given the power to abolish the office of commonwealth's attorney in this State, until it does so it cannot abolish the tenure of any rightful incumbent of the office. He might be impeached, but not legislated out of office. Cooley's Const. Lim. (6th Ed.), 482; Black, Const. Prohib., p. 119, sec. 99." 83 S. W., 1035, 1037, 119 Ky., 364.

To the same effect is *State* v. *Wiltz*, 11 La. Ann., 439, wherein the court said:

"It is inadmissible to say that a person holding an existing office under a fixed tenure can be removed, or that his regular term of office can be abridged, by an

ordinary act of the legislature other than an act abolishing the office."

The same rule obtains in this State. In *State* v. *Leonard,* 86 Tenn., 485, 7 S. W., 453, the court had under consideration chapter 84, p. 163, Acts of 1887, which contained the following provisions:

"Sec. 2. Be it further enacted that from and after the first Monday in April, 1887, the office of chairman of Marshall county court is, and shall be, hereby restored and re-established in said county, with all the rights, privileges, jurisdictions, duties and powers, possessed by, and vested in, and belonging to the office of chairman and judges of the county court of the various counties of this State, and that from and after the said first Monday in April, 1887, the office of the county judge of Marshall county be, and is, and shall be, hereby abolished. . . .

"Sec. 4. Be it further enacted that the chairman of the county court of Marshall county shall have, possess, exercise and discharge all the rights, privileges, and duties and shall have, possess and exercise and discharge all jurisdiction, powers, duties and privileges now possessed, exercised and discharged, and vested in, imposed and conferred by the act of 1875, chapter 70, and all existing laws, upon the chairman of the county courts of the various counties in the State; and said chairman is further invested with all the power and with the same jurisdiction and authority wherewith county judges are now invested, and shall comply with all the

requirements of, and perform all the duties imposed by law, creating and regulating the powers and duties of chairmen of the county courts and county judges of this State."

The court held that the foregoing act simply changed the name of the office, leaving its duties intact, and devolved those duties upon a person other than the incumbent at the time, and did not in fact abolish the office, but was an abortive attempt to legislate the incumbent out of office. It was held that this could not be done.

The same doctrine is recognized in *Halsey* v. *Gaines*, 2 Lea, 316, 324, 325; *Judges' Cases,* 102 Tenn., 510, 538-540, 53 S. W., 134; *State v. Lindsay,* 103 Tenn., 625, 53 S. W., 950; the *Redistricting Cases,* 111 Tenn., 234, 80 S. W., 750; *State, ex rel.,* v. *Hamby,* 114 Tenn., 361, 84 S. W., 622.

In the case before the court it appears that the act purports to abolish all offices existing under prior acts, and in the same act the same offices are re-enacted under different names. Under the former city charter there was a city tax assessor whose duty it was to assess property in the city for taxation; under the present act there is a city assessor whose duty is the same. Under the former acts there were a city attorney and assistant attorney, whose duty it was to attend to the city's legal business; under the present act there is a city counselor and assistant counselor, whose duties are the same. Under the former acts there was a judge and a clerk of the city court; under the present act there is a judge

and a clerk of the corporation court, the jurisdiction being the same, and the duties of these offices, the same. The chief officer of the city was formerly styled "mayor;" under the present act he is called "president." In both cases his duty is to exercise a general superintendence over the city and to see that the laws are enforced. So, under the former acts what is now called the "vice president" was then called the "vice mayor," with substantially the same duties. It does not matter that the duties of these several officers may be to some extent enlarged under the present act as compared with the prior acts. The offices are substantially the same; the names being merely changed.

Men cannot be legislated out of office in this way. Even if the statute in question, or bill purporting to be a statute, could be treated as a valid amendatory act of prior legislation, it could not have the effect to remove the officers above named, and create a vacancy to be filled by appointment, since the same act which purports to abolish the offices restores them under another name. However, the act is wholly void.

So there is no point of view from which the demurrer can be sustained. It results that the decree of the chancellor must be reversed, and the cause remanded.